NOT YET SCHEDULED FOR ORAL ARGUMENT
NO. 21-1018 (AND CONSOLIDATED CASES)

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE
EARTH, and SIERRA CLUB,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents,*

AEROSPACE INDUSTRIES ASSOCIATION OF AMERICA, INC.,
and THE BOEING COMPANY.

*Intervenors.*

_____

On Petition for Review of Final Action by the United States
Environmental Protection Agency

_____

CORRECTED BRIEF OF *AMICUS CURIAE*
INTERNATIONAL COUNCIL ON CLEAN TRANSPORTATION
IN SUPPORT OF ENVIRONMENTAL AND STATE PETITIONERS

_____

Deborah A. Sivas
Molly L. Melius
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305
(650) 723-0325
dsivas@stanford.edu

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, AND SEPARATE BRIEFING

All parties, intervenors and other *amici* appearing in this case are listed in the State Petitioners' Opening Brief.

References to the ruling under review and related cases also appear in the State Petitioners' Opening Brief.

Pursuant to D.C. Circuit Rule 29(d), *amicus* International Council on Clean Transportation ("ICCT") states that it is aware of one other planned amicus brief in support of State and Environmental Petitioners in this case. Separate briefing is necessary because none of the other amicus briefs can provide insight borne from directly participating, for many years, in the International Civil Aviation Organization processes and committee negotiations that created the aviation rule which the U.S. Environmental Protection Agency then adopted. Based on more than a decade of internationally recognized aviation research, ICCT can also provide detailed, scientifically sound information about the technologically feasible options available to EPA for regulating greenhouse gas emissions based upon more than a decade of internationally recognized aviation research.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, RELATED
    CASES, AND SEPARATE BRIEFING ....................................... *ii*

TABLE OF AUTHORITIES ............................................................ *iii*

GLOSSARY .....................................................................................*ix*

IDENTITY & INTEREST OF AMICIUS CURIAE .................................1

RULE 29(a)(4) STATEMENT ...........................................................1

INTRODUCTION ..............................................................................2

BACKGROUND .................................................................................4

I.     Aviation in the Context of Climate Change ...................................4

II.    History of ICAO and the Chicago Convention ...............................5

III.   Internal ICAO Dynamics and Procedures ......................................6

IV.   Development of EPA's Aircraft Rule...............................................9

ARGUMENT ......................................................................................12

I.     The EPA Should Not Rely on the ICAO Process to
     Determine Domestic Policy for Aviation Greenhouse Gas
     Emissions.....................................................................................12

     A.    ICAO's Adoption Process and Substantive
         Mandate Differ Dramatically from EPA's. ........................12

     B.    The United States May Set More Stringent
         Domestic Aviation Standards and Has Done So in
         the Recent Past. ...............................................................14

II.    EPA's Aircraft Rule Will Not Reduce Aviation
     Greenhouse Gas Emissions. ..........................................................17

     A.    By the Time EPA's Standards Take Effect,
         Virtually All Aircraft Will Satisfy or Supersede
         Them....................................................................................17

B.    EPA's Own Analysis Shows That a More Stringent $CO_2$ Standard Than It Ultimately Adopted Was Both Technically Feasible And Economically Beneficial. ....................................................19

1.    Applying EPA's Standard to In-Service Aircraft Could Have Reduced Emissions While Minimal Demands on Industry. ....................................21

2.    EPA's Standards for New-Type and In-Production Aircraft Should Be Strengthened to Incentivize Technological Innovation and Reduce GHGs. ..........................................................23

3.    EPA Should Allow Manufacturers and Airlines To Use a Declining Fleetwide-Average Standard Instead of a Pass/Fail Standard to Allow for More Cost-Effective Compliance and Greater Emissions Reductions..............................................................26

CONCLUSION ...........................................................................30

CERTIFICATE OF COMPLIANCE........................................................31

CERTIFICATE OF SERVICE ............................................................31

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

42 U.S.C. § 7571 ................................................................2, 10, 16, 19

42 U.S.C § 7571(a) ...............................................................................17

42 U.S.C § 7571(a)(2) ..........................................................................10

49 U.S.C § 47521 .................................................................................15

49 U.S.C. § 47528(a) ...........................................................................15

**Other Authorities**

38 Fed. Reg. 19,088 (July 17, 1973) ...................................................19

70 Fed. Reg. at 69,644 (Nov. 17, 2005) .................................15, 16, 19

73 Fed. Reg. at 44,345 (July 30, 2008) ....................................9, 10, 21, 29

81 Fed. Reg. 54,422 (Aug. 15, 2016) ...........................2, 3, 5, 10, 16

86 Fed. Reg. 2136 (Jan. 11, 2021) ....................... 2, 10, 11, 17, 18, 19, 29

Ruwantissa Abeyratne, *Aviation and Climate Change, In Search of a
    Global Market Based Measure* (2014) ..............................................13

Center for Biological Diversity et al., Comment Letter on Notice of
    Proposed Rulemaking (NPRM): Control of Air Pollution From
    Airplanes and Airplane Engines (2020) EPA-HQ-OAR-2018-0276,
    .............................................................................................9, 10, 21, 27

Center for Clean Air Policy and Northeast States for Coordinated Air
    Use Management, *Controlling Airport Related Pollution* (2003) .....................27

Email from William Charmley, Director to U.S. EPA Office of
    Transportation and Air Quality Assessment and Standards Division
    (Feb. 16, 2016, 8:35 AM) EPA-HQ-OAR-2018-0276-0151, .........................6, 7

Chicago Convention on International Civil Aviation, Dec. 7, 1944, 15
U.N.T.S. 295 (9th ed. 2006, ICAO Doc. 7300/9), EPA-HQ-OAR-
2018-0276-0006 ..................................................................7, 14

Paul Dempsey, *Compliance and Enforcement in International Law:
Achieving Global Uniformity in Aviation Safety*, 30 N.C. J. Int'l L.
(2004).....................................................................................16

The Economist, *Some international regulators have been captured by
producer interests* (Nov. 24, 2018),
https://www.economist.com/leaders/2018/11/24/some-
international-regulators-have-been-captured-by-producer-interests.................13

Brandon Graver et al., *CO2 emissions from commercial aviation
(2019)*, EPA-HQ-OAR-2018-0276-0151 ............................................4

Brandon Graver & Dan Rutherford, *U.S. Passenger Jets under
ICAO's CO2 Standard*, *2018-2038* (2018), EPA-HQ-OAR-2018-
0151 ....................................................... 9, 17, 18, 22, 26, 27, 28, 29

ICCT "Comment Letter on Notice of Proposed Rulemaking (NPRM)
for Control of Air Pollution From Airplanes and Airplane
Engines," (2020), EPA-HQ-OAR-2018-0276-0001 ........... 9, 18, 21, 22, 23, 26,
27, 28, 29

ICF International, *Cost Analysis of CO2-Reducing Technologies for
Aircraft* (2015), EPA-HQ-OAR-2014-0828 ......................................25

Intergovernmental Panel on Climate Change, *Climate Change 2022,
Impacts Adaptation and Vulnerability, Summary for Policymakers*
(2022)......................................................................................4

International Civil Aviation Organization, *About ICAO* (last visited
March 8, 2022), https://www.icao.int/about-icao/Pages/
default.aspx ...............................................................................6

International Civil Aviation Organization, *GIACC/3-IP/1, Agenda
Item 2: Review of aviation emissions related activities within ICAO
and internationally Parallels between Noise and CO2
Environmental Goals* ¶ 2.2 (2009)...............................................15, 16

International Civil Aviation Organization, *The History of ICAO and The Chicago Convention* (last visited March 8, 2022), https://www.icao.int/about-icao/History/Pages/default.aspx ............................5

Anastasia Kharina et al., *Cost assessment of near and mid-term technologies to improve new aircraft fuel efficiency* (2016), EPA-HQ-OAR-2018-0276-0151....................................................................24, 25, 29

Mark Peterson, *The UAV and the Current and Future Regulatory Construct for Integration Into the National Airspace System*, 71 J. Air L. & Com. 521 (2006) ...............................................................16

Roz Pidcock et al., *Aviation could consume a quarter of 1.5°C carbon budget by 2050* (2016), *available at* https://www.carbonbrief.org/aviation-consume-quarter- carbon-budget...........................................5

Dan Rutherford, *Standards to promote airline fuel efficiency (2020)*, EPA-HQ-OAR-2018-0276-0151 ...................................... 5, 9, 18, 22, 26, 27, 28

Transport and Environment, *'We can live with this': How Airbus was allowed to write its own climate rules* (Jan. 27, 2018), **Error! Hyperlink reference not valid.** ...........................................7, 8, 12, 13, 14

U.S. General Accounting Office, GAO-01-1053, *Aviation and the Environment: Transition to Quieter Aircraft Occurred as Planned, but Concerns about Noise Persist* (2001), https://www.gao.gov/assets/240/232737.pdf ...................................................................15

United States, *United States-Only Cost-Benefit Analysis (CBA) of the International Civil Aviation Organization (ICAO) CO2 Standard Stringency Options (SOs)*, Tenth Meeting of Committee on Aviation Environmental Protection, Montreal (Feb. 1-12, 2016) .....................20

Sola Zheng & Dan Rutherford, *Fuel burn of new commercial jet aircraft: 1960 to 2019* (2020), EPA-HQ-OAR-2018-0276-0151 ......4, 5, 17, 18, 19, 22, 24, 26, 28

# GLOSSARY

| | |
|---|---|
| Aircraft Rule | *Control of Air Pollution From Airplanes and Airplane Engines: GHG Emission Standards and Test Procedures*, 86 Fed. Reg. 2136 (Jan. 11, 2021) |
| $CO_2$ | Carbon dioxide |
| Endangerment Finding | *Finding That Greenhouse Gas Emissions From Aircraft Cause or Contribute to Air Pollution That May Reasonably Be Anticipated To Endanger Public Health and Welfare*, 81 Fed. Reg. 54,422 (Aug. 15, 2016) |
| EPA | U.S. Environmental Protection Agency |
| FAA | Federal Aviation Administration |
| GHG | Greenhouse Gas(es) |
| ICCT | International Council on Clean Transportation |
| JA | Joint Appendix |
| Section 231 | 42 U.S.C. § 7571 |

## IDENTITY AND INTEREST OF AMICIUS CURIAE

The International Council on Clean Transportation ("ICCT") is an independent nonprofit organization that provides unbiased and internationally recognized research and technical, and scientific analysis to environmental regulators. ICCT staff includes scientific experts on the control of pollutants and greenhouse gas emissions from the aviation sector. Staff members have authored or coauthored more than 40 Working Papers and Information Papers related to the design of the carbon dioxide ("$CO_2$") standard developed by the International Civil Aviation Organization ("ICAO") and adopted by the Environmental Protection Agency ("EPA"). The program director for ICCT also has personally served as a technical observer during ICAO proceedings since 2008.

ICCT has a strong interest in ensuring that the Court's decision in this case furthers the development and use of sound, science-based policies in the aviation industry. This amicus brief will assist the Court's understanding of this matter by discussing the nature of ICAO proceedings and demonstrating that economically and technologically feasible options that can reduce greenhouse gas emissions from aviation were and remain available to EPA.

## RULE 29(a)(4) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4), ICCT represents that its counsel drafted this brief. No party or its counsel made a monetary

contribution intended to fund the preparation or submission of this brief, and no person other than amicus curiae or their counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

In 2016, EPA issued a finding under Section 231 of the Clean Air Act, 42 U.S.C. § 7571, recognizing that greenhouse gas emissions from the aviation sector "endanger the public health and welfare of current and future generations." *Control of Air Pollution From Airplanes and Airplane Engines: GHG Emission Standards and Test Procedures*, 81 Fed. Reg. 54,422 (Aug. 15, 2016) ("Endangerment Finding"). That finding triggered additional legal obligations, requiring EPA to take appropriate regulatory action to reduce emissions. This case concerns EPA's attempt to discharge these Section 231 duties by adopting a final rule regulating greenhouse gas emissions from airplanes and aviation engines. *Finding That Greenhouse Gas Emissions From Aircraft Cause or Contribute to Air Pollution That May Reasonably Be Anticipated To Endanger Public Health and Welfare*, 86 Fed. Reg. 2136 (Jan. 11, 2021) ("Aircraft Rule").

Unfortunately, the Aircraft Rule wholly misses the mark. By EPA's own admission and as demonstrated by independent technical analysis, the Aviation Rule will not reduce the greenhouse gas pollutants identified in EPA's Endangerment Finding. Rather than crafting standards to address the concerns

identified in its Endangerment Finding, EPA defaulted entirely to a narrow rule developed by ICAO, an international agency. EPA's rationale for doing so turns in part on its interpretation of diplomatic harmony. As Petitioners explain in their Opening Briefs, this concern is not tethered to Section 231's statutory requirements, and centering it in the rulemaking undermines the Clean Air Act's core purpose of protecting public health.

As discussed below, EPA's Aircraft Rule ignores cost-effective technologies to reduce greenhouse gas emissions and abdicates the agency's statutory duty to develop standards that actually protect public health from a known pollutant. ICAO has struggled to produce environmentally stringent regulations, in part due to industry dominance of internal proceedings and a lack of public transparency and accountability in the ICAO decision-making processes. EPA could and should have done much better. A more protective emissions standard could have been set without imposing unreasonable burdens on the aviation sector. Among a suite of other options, EPA could have extended its rule to in-service aircraft, adopted flexible means of compliance, or defined technological feasibility to better reflect the realities of currently available emission-reducing technologies. This Court should, therefore, grant the petitions for review and direct EPA to revise the rule to comport with Clean Air Act mandates to protect public and environmental health.

## BACKGROUND

## I.    Aviation in the Context of Climate Change

As the planet's changing climate careens towards disaster, aircraft emissions pose a significant and increasing share of global greenhouse gas emissions. Intergovernmental Panel on Climate Change, *Climate Change 2022, Impacts Adaptation and Vulnerability, Summary for Policymakers* 8, 13 (2022) ("IPCC 2022"); Sola Zheng & Dan Rutherford, *Fuel burn of new commercial jet aircraft: 1960 to 2019* at 1 (2020), EPA-HQ-OAR-2018-0276-0151 ("Zheng 2020"); Brandon Graver et al., *$CO_2$ emissions from commercial aviation, 2018* at 1-2 (2019), EPA-HQ-OAR-2018-0276-0151 ("Graver 2019"). These greenhouse gas emissions cause or contribute to the increasing intensity and severity of droughts, destructive storms, heatwaves, and flooding; the destabilization of agricultural production; the increased likelihood of certain infectious diseases; the widespread deterioration of ecosystems; and the acceleration of species extinction rates. IPCC 2022 at 8.

The aviation industry is one of the fastest growing sources of greenhouse gas emissions: Aviation emissions have increased by 44 percent over the last decade, with air traffic growing about four times faster than improved fuel efficiency from 2013 to 2019. Zheng 2020 at 1; Graver 2019 at 1-2. If commercial aviation were counted as a country, it would rank sixth, after Japan, in terms of total $CO_2$

emissions.  Zheng 2020 at 1.  And by 2050, commercial aircraft could consume nearly a quarter of the carbon emissions budget that scientists say is necessary to limit warming below the 1.5° C threshold and thereby avoid the worst climate change impacts.  Zheng 2020 at 1; Pidcock et al., *Aviation could consume a quarter of 1.5°C carbon budget by 2050* (2016), *available at* https://www. carbonbrief.org/aviation-consume-quarter- carbon-budget.

The United States is the world's largest emitter of aviation greenhouse gasses by a significant margin, with U.S aircraft alone emitting roughly a quarter of the world's total aviation carbon pollutants.  Dan Rutherford, *Standards to promote airline fuel efficiency* at 1 (2020), EPA-HQ-OAR-2018-0276-0151 ("Rutherford 2020").  To put that contribution in perspective, U.S. aircraft account for roughly six times more aviation greenhouse gas emissions than the Chinese aircraft fleet, the world's next largest source of aviation emissions.  81 Fed. Reg. at 54,468.

## II.    History of ICAO and the Chicago Convention

The 1944 Convention on International Civil Aviation, also known as the "Chicago Convention," resulted in the creation of ICAO.  The Chicago Convention's core objective was to develop civil aviation in a "safe and orderly manner" such that the air transport industry would operate "soundly and economically."  International Civil Aviation Organization, *The History of ICAO*

*and The Chicago Convention* (last visited March 8, 2022), https://www.icao.int/about-icao/History/Pages/default.aspx.  ICAO is a multilateral, United Nations agency designed to administer the Chicago Convention and to establish uniform international standards and policy recommendations for the civil aviation industry. International Civil Aviation Organization, *About ICAO* (last visited March 8, 2022), https://www.icao.int/about-icao/Pages/default.aspx ("About ICAO").

ICAO's Committee on Aviation Environmental Protection ("Committee") develops its greenhouse gas standards.  Because ICAO has no enforcement authority and all signatory nations retain jurisdiction over their domestic airspace, ICAO standards must be translated into binding regulations by national governments in order to take effect and "never supersede the primacy of national regulatory requirements." *Id.*

## III.    Internal ICAO Dynamics and Procedures

The vast majority of ICAO member nations are represented by their respective domestic aviation or transportation industry.  Email from William Charmley, Director to U.S. EPA Office of Transportation and Air Quality Assessment and Standards Division (Feb. 16, 2016, 8:35 AM), EPA-HQ-OAR-2018-0276-0151 ("Charmley Email").  This fact has sparked concern that regulatory capture influences ICAO's ability to deliver environmentally protective emissions limitations.  *Id.*  (noting EPA's efforts to achieve consensus in a context

in which "nearly every nation is represented by their transportation and/or aircraft industry.  Environmental protection is not a priority for these nations, growing their airline industry and domestic manufacturing industry is the priority"); *see also* Transport and Environment, *'We can live with this': How Airbus was allowed to write its own climate rules* (Jan. 27, 2018), **Error! Hyperlink reference not valid.**. ("Transport and Environment") (noting that emails between a European regulator and companies involved in the ICAO process revealed that "heavy influence from industry" led to a $CO_2$ "standard that will do nothing to cut aircraft emissions").

Unlike EPA, neither ICAO nor its Committee has a mandate to protect public health and welfare from the impacts of aircraft air pollution.  Instead, ICAO member nations and industry come to consensus on minimum standards and practices that all member nations can meet.  ICAO member nations are urged by the Chicago Convention to seek the "highest practicable degree of uniformity in regulations, standards, procedures and organization."  Chicago Convention on International Civil Aviation, art. 37, Dec. 7, 1944, 15 U.N.T.S. 295 (9th ed. 2006, ICAO Doc. 7300/9), EPA-HQ-OAR-2018-0276-0006.  In practice, this approach incentivizes industry representatives, who dominate the ICAO process, to press for aircraft emissions standards that all nations can meet, rather than standards that actually protect public health or welfare.

The ICAO Committee's process for developing greenhouse gas emissions standards is opaque by design. The invited participants and formal observers must sign non-disclosure agreements, and there is no mechanism for public participation or comment on the Committee process. Transport and Environment (explaining that "[m]eetings of [the Committee] are not public, and it is forbidden to disclose any documents. . . . those involved must sign a confidentiality agreement not to share what is submitted or said."). The final negotiation and voting process by which Committee standards are ultimately adopted frequently remains invisible, not only to the public, but also to the formal observers and invited participants. This is so because when consensus cannot be reached in plenary, the Committee chair calls what is known as a "members only" meeting to attempt to reach consensus. *Id.* (explaining that "[w]hen the final decisions were made in the February 2016 meeting, all observers were excluded and it was just the 24 states"). A single member from each country's delegation attends this closed meeting and the final standard is negotiated and reported back to plenary. *Id.* The Committee followed this approach when developing the aircraft $CO_2$ emissions standards at issue here. *Id.* As a result, negotiation of the final standard was invisible even to observers bound by non-disclosure agreements.

## IV.    Development of EPA's Aircraft Rule

EPA first took steps to regulate aviation greenhouse gas emissions by

issuing an Advanced Notice of Proposed Rulemaking in 2008. *See Regulating Greenhouse Gas Emissions under the Clean Air Act*, 73 Fed. Reg. 44,354 (July 30, 2008) ("2008 Notice"). The 2008 Notice identified a number of regulatory approaches deemed effective at reducing emissions, including allowing flexibility as to how airlines achieve compliance and regulating in-service aircraft. Rutherford 2020 at 2-4; Brandon Graver & Dan Rutherford, *U.S. Passenger Jets under ICAO's $CO_2$ Standard, 2018-2038* at 5-7 (2018), EPA-HQ-OAR-2018-0276-0151 ("Graver, Rutherford 2018"); Center for Biological Diversity et al., Comment Letter on Notice of Proposed Rulemaking (NPRM): Control of Air Pollution From Airplanes and Airplane Engines, 6 (2020) EPA-HQ-OAR-2018-0276 ("NGO Comments"). For example, the 2008 Notice discussed an emissions "averaging, banking and trading" program that would allow manufacturers and operators greater "flexibility in phasing-in and phasing out engine models." 73 Fed. Reg. at 44,472; NGO Comment at 6. This policy tool can facilitate faster and cost-effective emissions reductions. Graver, Rutherford 2018 at 6-7; Rutherford 2020 at 4; ICCT "Comment Letter on Notice of Proposed Rulemaking (NPRM) for Control of Air Pollution From Airplanes and Airplane Engines," 4 (2020), EPA-HQ-OAR-2018-0276-0001 ("ICCT Comment"). Additionally, rather than prescribe specific engine technologies, EPA discussed flexibility for regulated parties and the attainment of goals through optimization of airline operations and

aircraft structure.  73 Fed. Reg. at 44,470-71; NGO Comment at 6.  Importantly, because the Clean Air Act applies to all aircraft, EPA considered these regulatory solutions not only for newly-built aircraft but also for in-service aircraft, which would have enabled greater emissions reductions compared to the 2021 Aircraft Rule.  73 Fed. Reg. at 44,472.

But the domestic regulatory process stalled while ICAO worked to craft an international $CO_2$ standard – a delay that ultimately led to EPA's abandonment of the promising and flexible regulatory tools it discussed in 2008 in favor of conformity with a weak and rigid international standard.  EPA did not issue its formal Endangerment Finding until 2016.  That finding, which concluded that greenhouse gas emissions from aviation endanger public health and welfare, triggered statutory requirements under Section 231 to promulgate a rule regulating these dangerous emissions.  81 Fed. Reg. 54,422; 42 U.S.C § 7571(a)(2).  The following year, in 2017, ICAO formalized its standard.  86 Fed. Reg. 2137.  Then, four years later, EPA merely adopted the ICAO standard in all respects, with no attempt to develop independent standards consistent with its legal obligations under the Clean Air Act.  86 Fed. Reg. at 2139.  It did so despite the fact that EPA itself was "not projecting emission reductions associated with these [greenhouse gas] regulations."  86 Fed. Reg. at 2139.

The Aircraft Rule's failure to reduce greenhouse gas emissions is due in part to the fact that it does not regulate aircraft that are currently in use. The rule also does not affect in-production aircraft until 2028 – 12 years *after* ICAO adopted its standards. *Id.* at 2138, 2151.[1] The contours of the Aircraft Rule are summarized in the table below.

**Table 1: Summary of 2021 Final Aircraft Rule Applicability**

| Aircraft Type | Applicable | Date Rule Takes Effect | Aircraft Definition |
|---|---|---|---|
| **New-Type Aircraft** | Yes | 2021 2023 | Aircraft designs which have never been manufactured before: 2023 for certain small new-types. 2021 for all other new-types. |
| **In-Production Aircraft** | Yes | 2028 | Aircraft that are manufactured after the date of the rule. |
| **In-Service Aircraft** | No | | Aircraft currently in use. |
| **Military Aircraft** | No | | Aircraft used by the military, outside of civilian, commercial contexts. |
| **Supersonic Aircraft** | No | | Aircraft capable of traveling faster than the speed of sound. |

---

[1] Modifications to in-production aircraft that increase greenhouse gas emissions will trigger a requirement to meet the in-production standard five years early, beginning in 2023. 86 Fed. Reg. at 2138. However, in an exception that undermines the rule, parties may implement modifications *without* satisfying the standard, as long as the modification does not increase emissions by more than 1.5 percent. *Id.* at 2151. And there is no limit imposed on how many such modifications a party may make. *Id.* Thus, for the next six years, an airline can make serial modifications to its in-production aircraft that amount to significant emissions increases and still not trigger any requirements under the rule.

ARGUMENT

I.    **EPA Should Not Rely on the ICAO Process to Determine Domestic Policy for Aviation Greenhouse Gas Emissions.**

    A.    **ICAO's Adoption Process and Substantive Mandate Differ Dramatically from EPA's.**

EPA cannot rely on ICAO to craft its emission regulations, in part because the agency is bound by statutory mandates to protect domestic public health and welfare – mandates that ICAO simply need not and does not address. External observers and internal participants have raised serious concerns that the ICAO is deeply industry captured. For example, a recent investigative report indicates the Airbus corporation was so powerful within ICAO proceedings that it was allowed to directly redline and otherwise heavily dictate the European Union's final negotiating position on the stringency of ICAO's $CO_2$ rule, the same ineffective rule that EPA has now adopted here. Transport and Environment (explaining that "[e]mails released to Transport & Environment after an 18 month-long appeal process have confirmed that when crafting $CO_2$ rules for aircraft, the European Commission – the regulator – gave Airbus – the regulated entity – privileged access to the EU decision-making process and allowed Airbus to determine the EU position. The result is a standard which does nothing for the climate or public health."); *see also* The Economist, *Some international regulators have been captured by producer interests* (Nov. 24, 2018), *available at* https://www.

12

economist.com/leaders/2018/11/24/some-international-regulators-have-been-captured-by-producer-interests (concluding that the ICAO process "is a lesson straight from undergraduate economics.  Do not give the regulated power over the regulators, unless you want consumers to lose out and producers to game the system.").

ICAO's inability to craft environmentally protective regulations raises serious concerns about EPA's piggybacking approach.  *See* Ruwantissa Abeyratne, *Aviation and Climate Change, In Search of a Global Market Based Measure* 98 (2014) (stating that "ICAO has been talking about dealing with carbon pollution from airplanes for 16 years, but doing nothing.  The agency can't just keep playing its old game of promising climate action—next time—and then failing to deliver."); Transport and Environment (noting that ICAO's $CO_2$ standard "is not an isolated case but part of a pattern.").  ICAO simply does not have the same kind of substantive mandate or science-based decision process that necessarily animates EPA rulemaking.

The divergent mandates of EPA and ICAO have also resulted in important procedural differences in what passes for appropriate decision-making.  Bound by a notice and comment rulemaking process under the Clean Air Act, EPA's analysis is intended to be transparent and motivated by applicable science.  ICAO's process is ultimately driven by diplomatic consensus and industry preference.  That process

13

remains opaque to virtually everyone outside of participating member states and formal observers – who are themselves required to agree to strict non-disclosure agreements. Transport and Environment (explaining that "the above story was only possible because of how ICAO operates: behind closed doors and with no public or democratic scrutiny."). This guarded Committee process is unaccountable to public input and unresponsive to the dangers posed by unchecked greenhouse gas emissions. Unsurprisingly, it led to a standard that required no changes on the part of the aviation industry and resulted in no reduction of greenhouse gas emissions.

### B. The United States May Set More Stringent Domestic Aviation Standards and Has Done So in the Recent Past.

Article 38 of the Chicago Convention explicitly authorizes the United States to adopt domestic standards that are more protective than those that ICAO applies globally. Under the Convention, the U.S. retains sovereignty over both domestic and foreign aircraft operating in U.S. airspace and is fully empowered to adopt stricter "regulations or practices differing in any particular respect" from those established by ICAO. Chicago Convention, art. 38, chap. 2-3. Under Article 38, the United States need only give notice to other member nations of its intent to pursue more stringent standards. *Id.* As EPA itself has acknowledged, "it is expected that States will adopt their own airworthiness standards, and it is anticipated that some States may adopt standards that are more stringent than those

14

agreed upon by the ICAO." *Control of Air Pollution from Aircraft and Aircraft Engines; Emission Standards and Test Procedures*, 70 Fed. Reg. 69,644, 69,667 (Nov. 17, 2005).

In keeping with this regime, the United States has previously adopted aviation standards that are more stringent than ICAO's, including for in-service aircraft. For instance, in 2001, the United States adopted a stricter rule to phase-out noisy aircraft than ICAO had established, specifically to address the concerns of U.S residents living in close proximity to airports. U.S. General Accounting Office, GAO-01-1053, *Aviation and the Environment: Transition to Quieter Aircraft Occurred as Planned, but Concerns about Noise Persist* (2001), https://www.gao.gov/assets/240/232737.pdf ("USGAO 2001"); 49 U.S.C. § 47528(a); International Civil Aviation Organization, *GIACC/3-IP/1, Agenda Item 2: Review of aviation emissions related activities within ICAO and internationally Parallels between Noise and $CO_2$ Environmental Goals* ¶ 2.2 (2009) ("ICAO Noise Rule"). This rule, which estimated compliance costs ranging from $2.1 to $4.6 billion at the time of its adoption, was nevertheless defended by the United States as necessary to protect airport-adjacent citizens while permitting continued increases in airport capacity. 49 U.S.C § 47521; *see also* USGAO 2001 at 9, 11. The stricter rule moved up the date by which non-compliant aircraft were to be removed from service. ICAO Noise Rule at ¶ 2.2 (setting deadline that is 15

months after deadline set out in the United States' Aircraft Noise and Capacity Act of 1990.)

EPA also acknowledged its freedom to deviate from ICAO standards during a 2005 rulemaking on nitrogen oxide emissions and in its 2016 Endangerment Finding regarding aviation GHG emissions.  70 Fed. Reg. at 69,676 (stating that "more stringent standards" than ICAO called for "would likely be necessary and appropriate in the future"); 81 Fed. Reg. at 54,471 (noting EPA's intent to adopt standards of "at least equivalent stringency to the international $CO_2$ standard" and acknowledging that options above this baseline were permissible).[2]

While cooperation with ICAO is obviously important, it cannot and should not come at the expense of compliance with domestic law.  Under Clean Air Act Section 231, EPA must consider harm to public health and welfare from emissions, as well as the technological feasibility, cost, and safety of systems available to reduce that harm.  42 U.S.C § 7571(a).   By deviating from other ICAO standards, EPA has implicitly recognized that "uniformity" is neither an adequate nor a

---

[2] Other member States have likewise deviated from ICAO standards.  Paul Dempsey, *Compliance and Enforcement in International Law: Achieving Global Uniformity in Aviation Safety*, 30 N.C. J. Int'l L. 1, 17 n.65 (2004) (explaining that "[a]s of 2000, 55 states had notified ICAO of the differences between their domestic law and Annex 1").  A review of the differences filed pursuant to Article 38 "reveals that most deal with differences in terminology or involve more stringent practices."  Mark Peterson, *The UAV and the Current and Future Regulatory Construct for Integration Into the National Airspace System*, 71 J. Air L. & Com.  521, 559 n.197 (2006).

lawful basis for adopting an ineffective standard. And by its unquestioning adherence to the ICAO standard in the name of uniformity, EPA ultimately failed to regulate a dangerous pollutant.

## II.    EPA's Aircraft Rule Will Not Reduce Aviation Greenhouse Gas Emissions.

### A.    By the Time EPA's Standards Take Effect, Virtually All Aircraft Will Satisfy or Supersede Them.

EPA's Aircraft Rule fails to reduce aviation GHG emissions because all passenger aircraft will already meet or exceed the rule's standards by the time they take full effect. Graver, Rutherford 2018 at 1, 3-4, 7; 86 Fed. Reg. at 2138. EPA has acknowledged this outcome as true, conceding that it "anticipates nearly all affected airplanes to be compliant by the respective effective dates for new type designs and for in-production airplanes." 86 Fed. Reg. at 2138.

Independent ICCT analysis of global aircraft performance confirms EPA's conclusion. Zheng 2020 at 1; Graver, Rutherford 2018 at 7. In 2016, the average newly delivered aircraft was already more fuel efficient than the 2028 in-production standard. Zheng 2020 at 14-15. And ICCT analysis of the ten largest airline companies in the United States shows that, on average, the domestic fleet as a whole is expected to achieve compliance with the 2028 standard by 2024. Graver, Rutherford 2018 at 4. These global and domestic statistics illustrate that the Aircraft Rule does not promote additional emissions reductions beyond the

industry status quo.  ICCT Comment at 1, 3; Graver, Rutherford 2018 at 7;

Rutherford 2020 at 1; Zheng 2020 at 14.

The rule's ineffectiveness is caused in part by the unreasonably limited

definition of technological feasibility that ICAO's Committee used during its

standard setting process.  The Committee interprets technological feasibility to

refer only to airframe and engine technologies that have already reached

commercial maturity for a variety of aircraft types at the time a standard is set –

essentially defining as feasible *only what has already been built and is in use*.[3]

ICCT Comment at 2.  In this instance, although the rule does not take full effect

until 2028, the Committee defined technological feasibility to exclude even new

aircraft and engine technologies set to be delivered as early as 2016.  ICCT

Comment at 2.  For this reason, no additional improvements are required to comply

with the rule and "even independent of the ICAO standards, nearly all airplanes

produced by U.S manufacturers will meet the ICAO in-production standards in

2028."  86 Fed. Reg. at 2139.

---

[3] The Committee uses Technology Readiness Levels, a scale of technology
maturity developed by the National Aeronautics and Space Administration.
Technologies are graded on a scale ranging from TRL 1, basic research begun, to
TRL 9, flight proven in a commercial environment.  The ICAO Committee defines
technological feasibility as technologies having already achieved a TRL 8 of 9,
flight qualified in an actual aircraft in 2016.  This definition excludes new
technologies that would be shortly introduced into new, more fuel-efficient aircraft
from being used to establish standard stringency.

By contrast, the Clean Air Act authorizes EPA to craft technology-forcing standards in order to achieve the aviation emission reductions necessary to protect public health.  42 U.S.C § 7571; 70 Fed. Reg. at 69,676; *Control of Air Pollution from Aircraft and Aircraft Engines: Emission Standards and Test Procedures for Aircraft*, 38 Fed. Reg. 19,088, 19,089 (July 17, 1973).  This mandate allows – indeed, requires – EPA to consider technology not yet widely utilized but reasonably attainable given due consideration to costs and lead time.  38 Fed. Reg. at 19,089.  In adopting ICAO's rule without modification, EPA defaulted to a definition of feasibility that requires virtually no technological innovation from the aircraft industry to achieve compliance.  86 Fed. Reg. at 2138-39.  It is thus not surprising that there are no "project[ed] emissions reductions associated with these GHG regulations" and that emissions will instead continue to intensify in the coming decades.  *Id.* at 2139; *see also* Zheng 2020 at 1.

    **B.**    **EPA's Own Analysis Shows That a More Stringent $CO_2$ Standard Than It Ultimately Adopted Was Both Technically Feasible And Economically Beneficial.**

EPA's Cost-Benefit Analysis, as completed with the Federal Aviation Administration ("FAA") and submitted to ICAO's environmental committee, concluded that a more stringent $CO_2$ standard than the final Aircraft Rule was both technically feasible and economically beneficial.  United States, *United States-Only Cost-Benefit Analysis (CBA) of the International Civil Aviation Organization*

(ICAO) CO2 Standard Stringency Options (SOs)*, Tenth Meeting of Committee on

Aviation Environmental Protection, Montreal, 3-4 (Feb. 1-12, 2016).[4]  EPA and

FAA calculated the climate, air quality, and net cost-benefit of ICAO's ten

potential stringency options for both a new-type and in-production $CO_2$ standard

for U.S. aviation beginning in 2020 and 2023, respectively.  *Id.*  Stringency Option

1 was the weakest option considered, and Stringency Option 10 the strongest.[5]  *Id.*

EPA concluded that – of these ICAO stringency options it considered – climate

and air quality benefits were maximized at Stringency Option 10 for new types and

Stringency Option 9 for in-production aircraft.  *Id.* (noting that Stringency Option

10 for new types and 8 for in-production aircraft provided the largest net benefits

after taking compliance costs into account).  Following a closed-door negotiation,

ICAO finalized its standard at the weaker levels of Stringency Option 8.5 for new

types and 7 for in-production aircraft, along with delaying in-production

requirements for five years to 2028.  Thus, in harmonizing to ICAO's

recommended standard, EPA disregarded its own analysis supporting more

---

[4] Because this document, which was obtained from EPA through a Freedom of
Information Act request, does not appear to be available on any public website,
ICCT attaches it to this brief for the Court's convenience.

[5] EPA could have and should have considered stringency options beyond level 10
in its rulemaking, but this 2016 Cost-Benefit Analysis was restricted to the weaker
stringency options the ICAO was considering, based on ICAO's highly limited
technological feasibility criteria.

stringent domestic requirements.

EPA has the authority and ability to implement emissions regulations that are both economically and technologically feasible and that effectively address pollutants identified as a threat to human health and well-being. EPA could have done any of the following to meaningfully reduce greenhouse gas emissions, with minimal burden on industry: 1) apply the rule to in-service aircraft; 2) strengthen the requirements for both new-type and in-production aircraft; and 3) allow airlines and manufacturers to use a declining fleetwide average standard and other more flexible means of compliance.

These options, presented in more detail below, were highlighted in stakeholder comments to the proposed Aircraft Rule. ICCT Comment at 2; NGO Comments at 24, 26-27. And a series of these options – including applying the Aircraft Rule to in-service aircraft, using flexible means of compliance, and adopting stronger new-type standards – were explored by EPA itself in its 2008 Advance Notice of Proposed Rulemaking before the agency abandoned its independent analysis in deference to an industry-captured and unaccountable international body. 73 Fed. Reg. at 44,470-72.

> **1.    Applying EPA's Standard to In-Service Aircraft Could Have Reduced Emissions While Placing Minimal Demands on Industry.**

The Aircraft Rule should be applied to in-service aircraft. Applying EPA's in-production standard to aircraft that are already in-service would incentivize retrofit or renewal of U.S. fleets and the retirement of disproportionately inefficient older aircraft. Rutherford 2020 at 2-4; Graver, Rutherford 2018 at 5-7; Zheng 2020 at 17; ICCT Comment at 3-4.

EPA could set an in-service aircraft standard in such a way as to minimize disruptions to airline fleet planning while still providing an incentive to improve fuel efficiency over time. In the hypothetical case where EPA applied its proposed 2028 standard to current airline fleets, nine of the ten major carriers and all regional carriers – which accounted for 99 percent of 2017 aviation demand – would either meet the standard or comply after small fuel efficiency improvements of two percent or less. Graver, Rutherford 2018 at 7. Only a single U.S carrier, Allegiant, which specializes in the use of older, used aircraft on minor routes, would require larger efficiency improvements, of about six percent, to meet this proposed standard. Graver, Rutherford 2018 at 7. Additionally, accelerating the retirement of older models could stimulate demand for more fuel-efficient aircraft technology from U.S. airframe and engine manufacturers. ICCT Comment at 4. Ultimately, by extending the standard to in-service aircraft, EPA could have made quantifiable progress to reduce aviation GHGs with minimal burden on the aviation industry.

22

2.    **EPA's Standards for New-Type and In-Production Aircraft Should Be Strengthened to Incentivize Technological Innovation and Reduce GHGs.**

Applying meaningful efficiency requirements to new aircraft designs is critical to achieving long-term aviation emissions reductions that protect the climate and public health.  ICCT Comment at 3.  EPA should strengthen the standard for new-type aircraft, giving adequate lead time to airlines to facilitate greater GHG reductions.  Because commercial development and deployment of fuel efficiency-related technology takes time, parties must be informed of new efficiency requirements far enough in advance that the investment, development, and incorporation of new technologies is feasible.  ICCT Comment at 3.  By setting such a weak new-type standard, and by applying it immediately when the standard was finalized in January 2021, EPA gave no lead-time to allow the new-type standard to reduce emissions.

EPA's standard for new-type aircraft could be strengthened by formulating more effective definitions of technological feasibility and, when necessary, increasing lead time associated with implementing the standard so cost-effective technologies can be pursued.  ICCT Comment at  3.  Incentivizing cost-effective technologies by tightening new-type aircraft standards would accelerate the low rate – historically one percent per year – of emissions reductions from aircraft efficiency improvements:  A comprehensive assessment of aircraft technologies

23

conducted in 2016 found that $CO_2$ emissions from U.S. aircraft could be reduced

six percent by 2030 and 30 percent by 2050 through the deployment of cost-

effective technologies for new-type aircraft.[6]  Zheng 2020 at iii; Anastasia Kharina

et al., *Cost assessment of near and mid-term technologies to improve new aircraft*

*fuel efficiency*, 28, 35 (2016), EPA-HQ-OAR-2018-0276-0151 ("Kharina et al.

2016.").

Stronger standards for in-production aircraft would also incentivize

innovations to reduce emissions.  As previously discussed, ICAO's definition of

technological feasibility included only those technologies that were widely

commercially available as of 2016 and excluded technologies set to be integrated

into concrete aircraft projects shortly thereafter.  As a result, new commercial jets

delivered in 2019 were, on average, already six percent more fuel efficient than

required by the 2028 in-production standard, and advanced new aircraft entering

into service in recent years exceeded the standard by 15 to 25 percent.  Zheng 2020

at 15.

EPA could have instead looked to new technologies to avoid an in-

production standard that upholds the polluting status quo.  In a 2015 report for

---

[6] Notably, these significant estimates are conservative and potential reductions
could be even greater.  Kharina et al. 2016 at 9 (noting that "technologies that
require larger changes in aircraft design and architecture . . . were excluded.  As a
consequence, the potential fuel burn reductions for 2034 scenarios assessed in this
study can be considered somewhat conservative." )

EPA covering 70 new technologies, the consultancy ICF concluded that incremental improvements could reduce the fuel burn of new in-production aircraft by 10 to 13 percent in 2033 compared to products available in 2015. ICF International, *Cost Analysis of $CO_2$-Reducing Technologies for Aircraft* at 13 (2015), EPA-HQ-OAR-2014-0828. A detailed analysis likewise concluded that ten discrete technologies could reduce the fuel burn of Single Aisle Aircraft by seven percent by 2028, which is when EPA's in-production standard takes full effect. *Id.* at 17. EPA should have taken this evidence into account when promulgating its rule and issued a more stringent standard to incentivize the uptake of these technologies.

Far from a burden or a sacrifice, the deployment of cost-effective fuel efficiency technologies also brings a variety of concrete social, economic and environmental benefits. Kharina et al. 2016 at 28. Airlines could reduce their fuel spending by 19 percent between 2025 and 2050 compared to business-as-usual trends. *Id.* at 35. If passed along to the consumer, these savings could lower ticket prices by up to $20 for short-haul flights and $105 for long-haul flights. *Id.* By 2050, consumption of total jet fuel could be cut by more than 20 percent, saving approximately $285 billion (2015 dollars) in fuel costs. *Id.* at 30. In sum, closing the cost-effective technology gap could provide "significant benefits to airlines, consumers, and the environment." *Id.* at 35. This undermines EPA's claims that a

more stringent US domestic standard would put domestic manufacturers at a competitive disadvantage relative to foreign competitors.

> **3.** **EPA Should Allow Manufacturers and Airlines to Use a Declining Fleetwide-Average Standard Instead of a Pass/Fail Standard to Allow for More Cost-Effective Compliance and Greater Emissions Reductions.**

The pass/fail standard used by EPA in its final rule is not a cost-effective way to reduce emissions. Graver, Rutherford 2018 at 7; Zheng 2020 at 17; Rutherford 2020 at 4. Standards that instead incorporate greater flexibility in how airlines are permitted to comply support more ambitious timeframes for emissions reductions and reduce compliance costs. Graver, Rutherford 2018 at 7; Rutherford 2020 at 4.

The pass/fail standard does not allow the sale or operation of individual aircraft types if they cannot comply with set emissions limits by a certain date. Graver, Rutherford 2018 at 7; Rutherford 2020 at 4; ICCT Comment at 4. Pass/fail standards incentivize policymakers to set standards based on the practices of the worst aircraft types or fleet so as to not require the blanket disqualification of a large number of aircraft. Zheng 2020 at 17; ICCT Comment at 4. This approach is problematic because it leads standards to be set based upon the performance of older aircraft designs, not modern technologies that are integrated into recently certified aircraft.

26

By contrast, flexible standards such as the declining fleetwide average allow a party to meet a slowly tightening emissions limit, on average, across its entire product line or in-service fleet. Graver, Rutherford 2018 at 6-7; Rutherford 2020 at 4; ICCT Comment at 4. This creates a less static standard that allows parties to meet emissions requirements through a wide series of measures not limited to individual aircraft performance. Graver, Rutherford 2018 at 6-7; Rutherford 2020 at 4. These measures include reducing operating aircraft weight or making operational changes to in-service aircraft. Rutherford 2020 at 4; NGO Comments at 25-27; Center for Clean Air Policy and Northeast States for Coordinated Air Use Management, *Controlling Airport Related Pollution* at III-7-11 (2003) ("CCAP Report"). Operational changes in particular include a wide variety of tools that industry can leverage to reduce emissions across a fleet. Rutherford 2020 at 4; CCAP Report at III-7-11; NGO Comm. at 25-27. Examples of operational changes include:

- Using single-engine taxiing;
- Optimizing flight timetables, route networks and flight frequency to reduce unnecessary stopovers and fuel-inefficient routing;
- Optimizing Air Traffic Control operations;
- Minimizing engine idling time on runways;
- Reducing engine thrust and reverse during take-off;
- Reducing the amount of excess fuel carried;
- Reducing auxiliary power units;

27

- Retiring the least efficient aircraft within a fleet; and
- More regular maintenance of engine and airframes to correct minor deteriorations.

Declining fleetwide average standards can either allow manufacturers or airlines to meet the emissions standard on average across all aircraft they deliver or operate in a year, known as averaging, or over a larger period of time, known as banking. Graver, Rutherford 2018 at 6-7; Rutherford 2020 at 4; ICCT Comment at 4. Either approach would reduce greenhouse gas emissions more than EPA's current pass/fail standard. Graver, Rutherford 2018 at 6-7; Rutherford 2020 at 4; Zheng 2020 at 17; ICCT Comment at 4. For new aircraft, an analysis of the current margin of manufacturer overcompliance with the ICAO rule found that a standard allowing averaging of aircraft types produced by the same manufacturers could be five percent more stringent than the pass/fail standard EPA is proposing. ICCT Comment at Appendix 3. A standard allowing manufacturers to bank credits from highly-efficient designs to comply with future, more stringent targets could be reasonably be set at eight percent higher than a pass/fail standard. *Id.* at Appendix 4.

Notably, use of a declining fleetwide average for in-service aircraft with averaging and banking also better accounts for existing efficiency differences between main U.S carriers. Trading of overcompliance credits helps address the problem of the least capable and largest emitting U.S airline – in this case

Allegiant – by allowing it to continue to use its older aircraft if it compensates by paying more efficient airlines that are overperforming the standard. Graver, Rutherford 2018 at 6, fn. 5. Additionally, given the relatively long useful life of aircraft, the banking of early overcompliance credits for future use as standards tighten is rational behavior in the airline context. *Id.* EPA itself considered the banking and trading approach in its original 2008 proposal on aircraft greenhouse gas regulation. 73 Fed. Reg. at 44,472-73.

Finally, a flexible approach for in-service aircraft could better incentivize aircraft to improve their efficiency by becoming more lightweight, a practice that is currently disincentivized because EPA bases emissions targets, in part, on an aircraft's weight. ICCT Comment at 5; 86 Fed. Reg. at 2145. As a general rule, lighter weight classes have more stringent emissions caps. ICCT Comment at 4-5. As a result, design changes that improve fuel efficiency by decreasing weight, such as altering seating density, use of lightweight materials, or changing lower-deck cargo transport practices, remain under-incentivized and under-rewarded. ICCT Comments at 5; *see also* 86 Fed. Reg. at 2145. This result is problematic because structural improvements alone, like the use of more lightweight materials, account for about 20 percent of the assessed technologies that could be implemented to improve fuel efficiency through 2034. Kharina et al. 2016 at 25, Figure 6.

## CONCLUSION

The United States is by far the world's largest aviation carbon polluter.

Technologically and economically feasible options to reduce aviation emissions

are readily available.  The Court should remand the Aircraft Rule to EPA for

reconsideration and proper discharge of the agency's statutory duties under the

Clean Air Act.

Dated:  March 21, 2022                 Respectfully submitted,

                                       ENVIRONMENTAL LAW CLINIC
                                       Mills Legal Clinic at Stanford Law School


                                       By:   */s/ Deborah A. Sivas*
                                             Deborah A. Sivas
                                             Molly L. Melius[7]

                                             Counsel for *Amicus Curiae International
                                             Council on Clean Transportation*

---

[7] Stanford Law Student Alana R. Reynolds contributed significantly to this brief through research and drafting.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief is printed in 14-point font and contains 6,494 words exclusive of the certificate as to parties, rulings, related cases, and separate briefing; table of contents; table of authorities; signature lines; biographical appendix; and certificates of service and compliance.

## CERTIFICATE OF SERVICE

I hereby certify that, on May 5, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system, which served a copy of the document on all counsel of record in the case.

*Deborah A. Sivas*
Deborah A. Sivas

**ATTACHMENT**
**COMMITTEE ON AVIATION ENVIRONMENTAL PROTECTION**

USCA Case #21-1018        Document #1945677              Filed: 05/05/2022      Page 41 of 84



# COMMITTEE ON AVIATION ENVIRONMENTAL PROTECTION (CAEP)

## TENTH MEETING

### Montréal, Canada, 1 to 12 February 2016

**Agenda Item 5: $CO_2$ Standard development**

### UNITED STATES-ONLY COST-BENEFIT ANALYSIS (CBA) OF THE INTERNATIONAL CIVIL AVIATION ORGANIZATION (ICAO) $CO_2$ STANDARD STRINGENCY OPTIONS (SOs)

(Presented by the United States)

**SUMMARY**

Given previous CAEP recognition of the need to consider the interdependencies of noise, fuel burn, and emissions, the United States has conducted a cost-benefit analysis, as it had done previously for CAEP/8 and CAEP/9. This paper provides final CBA results of the $CO_2$ standard with respect to United States-only emissions, with explicit consideration of interdependencies and uncertainties among environmental impacts. The analysis informed United States' views and decision-making in regards to a $CO_2$ standard. This paper is designed to supplement CAEP/10-IP/24.

## 1. INTRODUCTION

1.1        This paper presents results from an environmental benefit analysis conducted by the United States to assess the interdependent impacts associated with the $CO_2$ standard stringency options (SOs) under consideration by the Committee on Aviation Environmental Protection (CAEP) with respect to United States-only emissions and costs. The results of this benefit analysis are then compared to the results of the cost analysis contained in the Modelling and Databases Group (MDG)/Forecasting and Economic Analysis Support Group (FESG) CAEP/10 $CO_2$ main Cost-Effectiveness Analysis (CAEP/10-WP/16 and CAEP/10-IP/6) to create a cost-benefit analysis (CBA). Additional details from this analysis are provided in Appendix A of this paper. CAEP/10-IP/24 details additional analysis assessing the impacts of the $CO_2$ standard SOs with respect to global emissions and costs. Details from both of these analyses were used to inform United States' views on the $CO_2$ SOs.

1.2        This paper is a presentation of results supplemental to those in CAEP/10-IP/24 and is intended for standalone use only. As such, this paper and its appendix not only presents full results from the United States-only CBA, but also provides background information regarding tools, processes, and inputs only when they differ from those in the global CBA.

2019-003083-1261

1.3        The **two significant differences** between the United States and global CBA methodologies are: (1) the use of two different models for calculating air quality impacts[1] and (2) FESG-calculated total costs for the United States-only analysis include only recurring Direct Operating Costs (DOC) while total costs for the global analysis also include Asset Value Loss (AVL), and Non-Recurring Manufacturer Technology Response Costs (NRC). Therefore, all CBA results presented in this paper are based on landing and take-off (LTO) -only air quality results. For additional details on these differences, see Appendix A, Section 2. As all remaining background information in CAEP/10-IP/24, Section 2 ("Background") applies equally to this paper, a background section is not included.

1.4        The analyses performed to date do not reflect any final conclusion or prejudge the methodology of any future analysis by any department or agency of the United States regarding the benefits, costs, or other impacts of any aviation sector regulation to reduce greenhouse gas (GHG) and/or non-GHG emissions. Any such future analyses, including any regulatory impact analyses conducted to support federal regulatory actions, may differ from the analyses developed in support of this Information Paper and will be consistent with the United States regulating agency's statutory authority and the Executive Orders, including the United States Government methodology for valuing the social cost of carbon, that prescribe the requirements of agency regulatory impact analyses.

## 2.    EXECUTIVE SUMMARY OF RESULTS

### 2.1        High Level Overview

2.1.1        The CBA demonstrates that most scenarios yield economic and environmental benefits compared to a no-policy baseline, with exceptions for Case1 SO1-SO2 and Case4c SO2 (see Figure 1 and Table 1-Table 3). For each framework case analyzed, climate benefits relative to the baseline always increase as the standard becomes more stringent. For most scenarios, FESG-calculated total costs show a positive cost savings relative to the baseline. While the remaining scenarios, Case1 SO1-SO2 and Case4c SO2, show costs slightly higher than those in the baseline scenario, this cost increase is no greater than ~$1.2 billion (in 2010 United States dollars (USD)) for any scenario (see Figure 1 and Table 1-Table 3). Due to the variability in $NO_x$ performance of individual aircraft available in the fleet for each scenario, air quality impacts do not always increase with increasing SO. No United States-only scenarios were analyzed with respect to noise (see CAEP/10-IP/24, Section 2.3.2).

2.1.2        For all scenarios analyzed, the savings due to FESG-calculated total cost savings for a specific scenario are larger than the climate or air quality benefits. In contrast to the global analysis, the United States-only analysis shows climate benefits always greater than air quality benefits for a given scenario.

2.1.3        For this summary of results, *climate benefits* are defined as the benefits due to the reduction in aviation-attributable climate impacts. *Total environmental benefits* are defined as the benefits due to changes in climate and air quality impacts. *Net cost-benefit* is defined as the sum of total environmental benefits and FESG-calculated total cost savings.

---

[1] These two models are detailed in Appendix A, Section 2.1 and CAEP/10-IP/24, Appendix A, Section 2.1.2. One key difference between the types of outputs produced by these models is that the United States-only model calculates impacts only for landing-and-takeoff (LTO) emissions while the global model captures impacts for both LTO and full flight emissions.

- 3 -                                                                                      CAEP/10-IP/23

2.1.4        All results presented in this paper assume a midrange lens and 3% discount rate for environmental benefits and a 0% discount rate for total cost savings unless otherwise noted.

2.1.5        All results presented in this paper are highly dependent on the choice of model inputs and the fidelity of the modeling at each step. Changes in the input assumptions, including the manner in which specific aircraft types respond to various SOs, could have a significant impact on overall cost-benefit results. Fleet modeling processes and assumptions are detailed in CAEP/10-WP/16 and CAEP/10-IP/6.

## 2.2        Scenarios Providing Maximum Benefit

2.2.1        *Maximum Climate Benefit:* Due to the global nature of climate impacts, climate benefits are calculated as global savings from a reduction in United States-only emissions. Since the earliest In-Production ($I_NP$) applicability date is 2023, Hybrid 2023 C4SO10-C1SO9 (New Type (NT) SO10/$I_NP$ SO9) provides the largest climate change benefit relative to the baseline, at ~$9 billion (in 2010 USD). Although an $I_NP$ applicability date of 2020 is not under consideration, Case1 2020 SO9 was modeled and shows a slightly greater climate benefit relative to the baseline, still at ~$9 billion (in 2010 USD). This data is shown in Figure 3 and Table 4-Table 6. Hybrid 2023 C4CSO10-C1SO9 (NT SO10/$I_NP$ SO9) provides the largest climate benefit relative to the baseline in the global analysis (see CAEP/10-IP/24, Section 3.2.1).

2.2.2        *Maximum Total Environmental Benefit:* Since the earliest $I_NP$ applicability date is 2023, Hybrid 2023 C4SO10-C1SO9 (NT SO10/$I_NP$ SO9) provides the largest environmental benefit relative to the baseline, at ~$11 billion (in 2010 USD). Although an $I_NP$ applicability date of 2020 is not under consideration, Case1 2020 SO9 was modeled and shows a slightly greater total environmental benefit relative to the baseline, still at ~$11 billion (in 2010 USD). This data is shown in Figure 2 and Table 4-Table 6. Hybrid 2023 C4CSO10-C1SO5 (NT SO10/$I_NP$ SO5) provides the largest total environmental benefit relative to the baseline in the global analysis (see CAEP/10-IP/24, Section 3.2.2; as discussed in that section the maximum benefit is achieved at this SO rather than at a higher SO due to the sensitivity of the air quality results to the underlying assumptions).

2.2.3        *Maximum Net Cost-Benefit:* Hybrid 2023 C4CSO10-C1SO8 (NT SO10/$I_NP$ SO8) provides the maximum net cost-benefit relative to the baseline, at ~$60 billion (in 2010 USD). The next NT SO level achieves maximum benefits at Hybrid 2023 C4CSO9-C1SO8 (NT SO9/$I_NP$ SO8), at ~$51 billion (in 2010 USD). This data is shown in Figure 1 and Table 1-Table 3. Hybrid 2023 C4CSO10-C1SO8 (NT SO10/$I_NP$ SO8) provides the maximum net cost-benefit relative to the baseline in the global analysis (see CAEP/10-IP/24, Section 3.2.3).

## 2.3        Impact of Applicability, SO, and Scope on Cost Benefit

2.3.1        *Impact of Standard Applicability*

2.3.1.1        A Case1 framework case yields more benefits than a Case4c framework case for the same SO and implementation year for all SOs analyzed. This is due to the fact that the Case1 framework case applies to both NT and $I_NP$ while the Case4c framework case applies to only NT.

2.3.1.2        A Hybrid framework case with a given NT implementation year yields greater benefits than a Case4c framework case with the same implementation year for corresponding SOs. This is because the Hybrid framework case impacts $I_NP$ as well as NT, adding benefits from $I_NP$ applicability to the existing benefits from NT implementation. A Hybrid framework case with a given $I_NP$ implementation

year also yields greater benefits than a Case1 framework case with the same implementation year for corresponding SOs. This is because the Hybrid framework case impacts the NT aircraft at an earlier implementation date than $I_NP$, effectively implementing a portion of the Case1 framework case at an earlier date than in the Case1-only framework case. For the same NT and $I_NP$ SO, a Hybrid framework case yields benefits between those of Case1 for the NT implementation year and Case1 for the $I_NP$ implementation year at the same SO. This is because the Hybrid is essentially implementing the NT portion of the framework case early relative to the later Case1 implementation (leading to an increase in benefits relative to Case1) and implementing the $I_NP$ portion of the framework case late relative to the earlier Case1 implementation (leading to a reduction in benefits relative to Case1). For instance, Hybrid 2023 NT SO9/$I_NP$ SO9 (with NT implementation in 2020 and $I_NP$ implementation in 2023) yields benefits above those for Case4c 2020 SO9 and between those for Case1 2020 SO9 and Case1 2023 SO9.

2.3.1.3        For the SOs for which both Case1 and Case4c were analyzed for the 2020 implementation year (SO2-SO9), the net benefits of a given SO for Case4c were, on *average* over all SOs, ~$17 billion (in 2010 USD) lower than for Case1. For the SOs for which both a standalone and a hybrid framework case were analyzed, the net benefits of the Hybrid 2023 framework case (with NT implementation in 2020) relative to the Case4c 2020 framework case (considering all hybrid scenarios that included a given NT SO) were, on *average* over all SOs, ~$13 billion higher (in 2010 USD). The net benefits of the Hybrid 2023 framework case relative to the Case1 2023 framework case were, on *average* over all SOs, ~$17 billion higher (in 2010 USD).

2.3.2        *Impact of Increasing SO*

2.3.2.1        Case1: The net cost-benefit for Case1 shows generally greater benefits as SO is increased, with the exception that Case1 SO4 shows a lower benefit than SO3 (see Figure 1 and Table 1). The most beneficial SO (SO9) has a net benefit ~$52 billion (in 2010 USD) greater than the least beneficial (SO1) for a 2020 implementation year and ~$37 billion greater for the 2023 implementation year.

2.3.2.2        Case4c: Case4c shows increasing benefits with increasing SO for all SOs. A full CBA was only conducted for Case4c for the 2020 implementation year. The difference in benefits between the most beneficial SO analyzed (SO10) and the least beneficial SO analyzed (SO2) was ~$34 billion (in 2010 USD).

2.3.2.3        Hybrid: The CBA trends for the hybrid framework cases follow a combination of Case1 and Case4c trends for almost all SO combinations, with generally increasing benefits for each increase in NT (Case4c) SO given a fixed $I_NP$ (Case1) SO and generally increasing benefits with increasing $I_NP$ SO for a fixed NT SO. Exceptions lie in the trends in the results for fixed NT SO6, SO7, SO9, and SO10 for Hybrid 2023 and 2025 and in the results for fixed $I_NP$ SO3 for Hybrid 2023 (see Figure 1 and Table 3). For both Hybrid 2023 and Hybrid 2025, $I_NP$ SO6 is less beneficial than $I_NP$ SO5 for NT SO6 and SO7 (due to the sensitivity of $NO_X$ emissions changes to specific aircraft responses to SOs), and $I_NP$ SO9 is less beneficial than $I_NP$ SO8 for NT SO9 and SO10 (due to the assumption that some $I_NP$ aircraft voluntarily respond to NT SO (SO9 or SO10) prior to $I_NP$ SO implementation). For Hybrid 2023, $I_NP$ SO4 is more beneficial than $I_NP$ SO3 for NT SO10, and NT SO4 is less beneficial than NT SO3 for $I_NP$ SO3. The difference in benefits between the most beneficial SO (NT SO10/$I_NP$ SO8) and the least beneficial SO (NT SO4/$I_NP$ SO4) was ~$51 billion (in 2010 USD) for Hybrid 2023 and ~$47 billion for Hybrid 2025.

2.3.3          *Impact of Implementation Year:* Given the fixed policy-impact time frame (implementation year through 2040), a later implementation year always results in reduced savings for a given SO relative to the baseline. For the three-year delay in Case1 implementation from 2020 to 2023, the net benefits for a given SO were reduced, on *average* over all SOs, by ~$7 billion (in 2010 USD). For the two-year delay in implementation of the $I_NP$ component of the Hybrid cases from 2023 to 2025, the net benefits of a given SO were reduced, on *average* over all SOs, by ~$3 billion (in 2010 USD). A complete CBA for Case4c was only conducted for a single implementation year (2020), so a similar comparison could not be made for Case4c.

2.3.4          *Monetized Climate Benefits Using United States Government (USG) Social Cost of Carbon (SCC) Method:* The USG SCC method was used to calculate the benefits resulting from reduced $CO_2$ emissions due to the scenarios under consideration. The trends between the climate benefits of different scenarios as calculated with the SCC values are the same as the trends using APMT-I. The results from the APMT-I Climate Model using a midrange lens and 3% discount rate closely match those from the 2.5% discount rate SCC analysis, with these APMT-I Climate results ~$0.1 billion greater than these SCC values, on *average* over all SOs.

— — — — — — —

CAEP/10-IP/23
**Appendix A**

# APPENDIX A

## UNITED STATES-ONLY COST-BENEFIT ANALYSIS (CBA) OF CAEP/10 CO$_2$ STRINGENCY OPTIONS (SOs)

1. **Introduction** .................................................................................................................. **3**
2. **Background** ................................................................................................................... **3**
   2.1 United States-Only Air Quality Model ............................................................... 3
3. **High-Level Results** .................................................................................................... **4**
   3.1 Net Cost-Benefit Analysis Results ..................................................................... 4
   3.2 Total Environmental Benefit Results .................................................................. 9
4. **Results By Impact Type** ......................................................................................... **16**
   4.1 Climate .............................................................................................................. 16
   4.2 Air Quality ........................................................................................................ 21
5. **Climate Benefits Computed Using United States Government (USG) Social Cost of Carbon (SCC) Method** ...................................................................................... **27**
6. **Sensitivity to Major Assumptions** ........................................................................ **32**
   6.1 Environmental Discount Rate Analysis ............................................................ 32
   6.2 Lens Analysis .................................................................................................... 35
7. **References** ................................................................................................................. **39**

### LIST OF TABLES

Table 1: Summary of Mean Costs and Benefits for Case1 Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate ...................... 6
Table 2: Summary of Mean Costs and Benefits for Case4c Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate ...................... 7
Table 3: Summary of Mean Costs and Benefits for Hybrid Cases Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate ...................... 7
Table 4: Summary of Environmental Benefits for Case1 Relative to Baseline Using Midrange Lens and 3% Discount Rate .................................................................................................................. 11
Table 5: Summary of Environmental Benefits for Case4c Relative to Baseline Using Midrange Lens and 3% Discount Rate .................................................................................................................. 12
Table 6: Summary of Environmental Benefits for Hybrid Cases Relative to Baseline Using Midrange Lens and 3% Discount Rate .................................................................................................. 12
Table 7: Summary of SCC-Calculated Climate Impacts for Case1 Relative to Baseline ........................... 29
Table 8: Summary of SCC-Calculated Climate Impacts for Case4c Relative to Baseline ........................ 30
Table 9: Summary of SCC-Calculated Climate Impacts for Hybrid Cases Relative to Baseline .............. 30

### LIST OF FIGURES

Figure 1: Summary of Net Cost-Benefit for All Scenarios Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate ...................... 5
Figure 2: Summary of Total Environmental Benefits for All Scenarios Relative to Baseline Using Midrange Lens and 3% Discount Rate ............................................................................................ 10
Figure 3: Summary of Climate Benefits for All Scenarios Relative to Baseline Using Midrange Lens and 3% Discount Rate .............................................................................................................. 17
Figure 4: Climate Benefits for Case1 Relative to Baseline Using Midrange Lens and 3% Discount Rate 18
Figure 5: Climate Benefits for Case4c Relative to Baseline Using Midrange Lens and 3% Discount Rate 19

CAEP/10-IP/23
**Appendix A**                                          A-2

Figure 6: Climate Benefits for Hybrid 2023 Relative to Baseline Using Midrange Lens and 3% Discount Rate ......................................................................................................................................... 20

Figure 7: Climate Benefits for Hybrid 2025 Relative to Baseline Using Midrange Lens and 3% Discount Rate ......................................................................................................................................... 21

Figure 8: Summary of Air Quality Benefits for All Scenarios Relative to Baseline Using Midrange VSL and 3% Discount Rate .......................................................................................................... 22

Figure 9: Air Quality Benefits for Case1 Relative to Baseline Using Midrange VSL and 3% Discount Rate ........................................................................................................................................ 23

Figure 10: Air Quality Benefits for Case4c Relative to Baseline Using Midrange VSL and 3% Discount Rate ......................................................................................................................................... 24

Figure 11: Air Quality Benefits for Hybrid 2023 Relative to Baseline Using Midrange VSL and 3% Discount Rate .............................................................................................................................. 25

Figure 12: Air Quality Benefits for Hybrid 2025 Relative to Baseline Using Midrange VSL and 3% Discount Rate .............................................................................................................................. 26

Figure 13: Summary of Climate Benefits for All Scenarios Relative to Baseline Using SCC 2.5%, 3%, and 5% Discount Rates, SCC 95th Percentile, and APMT-I Midrange Lens (with a 3% Discount Rate) ......... 28

Figure 14: Discount Rate Sensitivity: Climate Benefits for Case1 2023 Relative to Baseline Using Midrange Lens ........................................................................................................................ 33

Figure 15: Discount Rate Sensitivity: Air Quality Benefits for Case1 2023 Relative to Baseline Using Midrange VSL ....................................................................................................................... 34

Figure 16: Discount Rate Sensitivity: Net Cost-Benefit for Case1 2023 Relative to Baseline Using Midrange Environmental Lens and 0% Total Cost Discount Rate .......................................... 35

Figure 17: Lens Sensitivity: Climate Benefits for Case1 2023 Relative to Baseline Using 3% Discount Rate ......................................................................................................................................... 36

Figure 18: VSL Sensitivity: Air Quality Benefits for Case1 2023 Relative to Baseline Using 3% Discount Rate ......................................................................................................................................... 37

Figure 19: Lens Sensitivity: Net Cost-Benefit for Case1 2023 Relative to Baseline Using 3% Environmental Discount Rate and 0% Total Cost Discount Rate ............................................. 38

## 1. INTRODUCTION

This appendix provides an overview of the results of a cost-benefit analysis (CBA) for the CAEP/10 $CO_2$ stringency options (SOs) that examines United States-only emissions and costs. For a description of the terms and acronyms used in this paper, see CAEP/10-IP/24, Appendix A, Section 1.2.

## 2. BACKGROUND

With the exception of the use of a different air quality model, all tools for the United States-only environmental impacts analysis are identical to those used in the global analysis. For this United States-only analysis, the climate model generates results for global impacts from United States-only emissions and the air quality model calculates United States-only impacts from United States-only emissions. At a high level the effects modeled by the two air quality models (United States-only and global) are the same. A description of the United States-only air quality model follows.

One additional difference between the global and United States-only CBA methodology lies in the types of costs captured in the Forecast and Economic Analysis Support Group (FESG)-calculated total costs. For this United States-only analysis, these total costs include only recurring Direct Operating Cost (DOC), which consists of fuel cost, capital cost (finance and depreciation costs), and other DOC (crew, maintenance, landing, and route costs).

For a complete background on methods, model inputs and uncertainty, and the framework cases under analysis, see CAEP/10-IP/24, Appendix A, Sections 2, 3, and 4.

2.1        **United States-Only Air Quality Model**

The United States-only Air Quality Model within the Aviation Environmental Portfolio Management Tool – Impacts (APMT-Impacts), RSM v3, estimates the health impacts of particulate matter less than 2.5 μm in aerodynamic diameter ($PM_{2.5}$). The model captures both primary $PM_{2.5}$ (emitted directly from aircraft engines, mostly consisting of soot) and secondary $PM_{2.5}$ (aerosols formed in the atmosphere from $SO_2$, $NO_x$, and gaseous hydrocarbon emissions). Aircraft emissions within the landing-and-takeoff (LTO) cycle are modeled. Ozone-related health impacts are not considered here since they are estimated to be roughly 10% of PM-related impacts by studies within the APMT-I development effort,[1] analysis conducted in support of the Energy Policy Act of 2005 study,[2,3] and external studies such as the Clean Air for Europe Baseline Analysis.[4] RSM v3 quantifies PM-related health impacts in terms of incidences of premature mortality and their associated Value of Statistical Life (VSL).

Other United States Agencies, such as the United States Environmental Protection Agency (EPA), has its own guidance for quantifying and monetizing premature mortality that differs from that used by DOT. For the quantification of mortality incidence in the United States, EPA guidance, reviewed by its Science Advisory Board and used in the Regulatory Impact Analyses of its National Ambient Air Quality Standards, recommends a range of values based on functions derived from the American Cancer Society cohort and the Harvard Six-Cities study.[5,6] Furthermore, other United States Agencies, including EPA, also have their own guidance for mortality risk valuation that differs from that used by DOT. EPA's guidance, reviewed by its independent Science Advisory Board, recommends a central VSL of $9.7 million (in 2013 United States dollars (USD)).[7] This is the same value EPA used in its Benefits and Costs of the Clean Air Act, adjusted for inflation and income growth over time, and is applied uniformly to all averted deaths

associated with a policy regardless of age, income or other individual characteristics. One important difference between the EPA and DOT measures is that EPA utilizes values culled from the stated preference literature whereas the DOT results do not. The assumptions used in this analysis to quantify and monetize the benefits of premature mortality do not reflect final conclusions or prejudge the methodology or results of any future analysis by any department or agency of the United States regarding the impacts of PM and other non-GHG emissions. Any such future analyses, including any regulatory impact analyses conducted to support federal regulatory actions, may differ from the analysis presented in this information paper.

RSM v3 accounts for changes in future year anthropogenic emissions and their impact on aviation-attributable $PM_{2.5}$ mortalities. The global air quality model, in contrast, does not model changes in background emissions over time (see CAEP/10-IP/24, Appendix A, Section 2.1.2). Changes in future year anthropogenic emissions result in more significant aviation emissions impacts in future years.[8,9] Rojo,[1] Masek,[10] and Brunelle-Yeung[11] provide information on previous versions of the APMT-I Air Quality Model, while the most complete description of the current methodology is described in Ashok.[8]

Limitations of RSM v3 include a restricted scope of geographic coverage (United States-only) and consideration of health impacts from only LTO emissions. As such, the inputs to the United States-only model are also LTO-only emissions. Additionally, since the tool is based on an aviation emissions inventory from 2006, it does not account for changes in the spatial distribution of emissions relative to that year. The contribution of cruise emissions to surface air quality impacts is considered in the global tool as recent work shows that aircraft cruise emissions may cause degradation of air quality over a hemispheric scale.[12,13] The benefits in this category (Air Quality) are likely to be underestimated due to the fact that only PM2.5 is quantified and monetized here and other effects such as ozone emissions are not examined.

Like the global air quality model, the United States-only model does not include lenses. The United States-only model does, however, include uncertainty in modeling, emissions, and CRF. The distributions used in the model are detailed in Ashok.[14] Although RSM v3 is capable of providing monetary valuations as well as health impacts, this analysis instead applied a VSL consistent with that used in the global analysis (see CAEP/10-IP/24, Appendix A, Section 4.4) to the mortalities output from the model.

## 3.  HIGH-LEVEL RESULTS

This section contains the United States-only CBA results, with limited explanations of those results. Since the United States-only air quality model calculates impacts only for LTO emissions, all analysis presented in based on LTO air quality results. For additional background on the results and plots included here, see CAEP/10-IP/24, Appendix A, Section 5.

### 3.1       Net Cost-Benefit Analysis Results

Figure 1 shows the CBA for Case1 2020, Case1 2023, Case4c 2020, Hybrid 2023, and Hybrid 2025. The length of each bar represents the sum of the total cost savings, mean climate benefits, and mean air quality benefits for each SO, and the error bars represent the sum of the 10th and 90th percentile climate and air quality benefits. Uncertainty in total cost savings is not included.

CAEP/10-IP/23
**Appendix A**

A-5



**Figure 1: Summary of Net Cost-Benefit for All Scenarios Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate**

Figure 1 shows a net benefit for almost all SOs relative to the baseline under the 3% environmental discount rate, midrange environmental lens, and 0% total cost discount rate. Case1 benefits are maximized at SO9 with a benefit of between $35 and $55 billion 2010 USD depending on the implementation year. The benefits for Case1 generally improve as the standard becomes more stringent, with the exception of SO4 having lower benefits than SO3. These Case1 trends are driven by which aircraft are forced out of the fleet and which aircraft have a technology response as the standard becomes more stringent. Case4c

CAEP/10-IP/23
**Appendix A**                                        A-6

benefits improve with each SO increase, with SO10 becoming the most cost beneficial SO for a Case4c framework case. Hybrid cases loosely follow a combination of the trends from the Case1 and Case4c CBA; however, Case1 SO9 and SO6 can be less beneficial and SO4 can be more beneficial than the next less stringent scenario when combined with certain Case4c SOs. Additionally, C4CSO4-C1SO3 is less beneficial than C4CSO3-C1SO3 for Hybrid 2023. The greatest hybrid benefit occurs at C4CSO10-C1SO8. The Case1 and Case4c United States-only CBA results follow generally the same trends as the results for the global LTO CBA, with the exception that Case1 SO9 is more cost-beneficial than SO8 for the United States-only case but not for the global case. The Hybrid United States-only CBA results follow generally the same trends as the results for the global LTO CBA, with exceptions in the trends for fixed Case4c SO6 and SO7 between Case1 SO5-SO6 for both Hybrid 2023 and Hybrid 2025, and for fixed Case4c SO10 between Case1 SO3-SO4 and for fixed Case1 SO3 between Case4c SO3-SO4 for Hybrid 2023.

Table 1, Table 2, and Table 3 show the environmental impacts and total cost savings leading to the net cost or benefit of a SO for all scenarios for which full environmental benefits (climate and air quality) and total costs are available. The data in the tables corresponds to that presented in Figure 1. Environmental benefits are given for a midrange lens at a 3% discount rate. Total cost savings are calculated using a 0% discount rate.

**Table 1: Summary of Mean Costs and Benefits for Case1 Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate**

| Case | SO | Total Cost Savings (2010 U.S. $Billion) | Climate Benefits (2010 U.S. $Billion) | Air Quality Benefits (2010 U.S. $Billion) | Net Cost-Benefit Relative to Baseline (2010 U.S. $Billion) |
|---|---|---|---|---|---|
| Case1 2020 | SO1 | -1.16 | 0.02 | 0.01 | -1.13 |
| | SO2 | -0.78 | 0.08 | 0.02 | -0.69 |
| | SO3 | 11.92 | 1.85 | 0.23 | 14.00 |
| | SO4 | 10.80 | 2.00 | 0.04 | 12.84 |
| | SO5 | 17.57 | 3.16 | 0.43 | 21.16 |
| | SO6 | 21.26 | 4.26 | 0.53 | 26.05 |
| | SO7 | 30.87 | 5.44 | 0.72 | 37.02 |
| | SO8 | 40.62 | 6.28 | 0.87 | 47.77 |
| | SO9 | 39.74 | 8.94 | 2.10 | 50.78 |
| Case1 2023 | SO1 | -1.13 | 0.02 | 0.00 | -1.11 |
| | SO2 | -0.83 | 0.06 | 0.01 | -0.76 |
| | SO3 | 7.81 | 1.37 | 0.16 | 9.35 |
| | SO4 | 6.64 | 1.46 | 0.03 | 8.13 |
| | SO5 | 11.70 | 2.36 | 0.31 | 14.36 |
| | SO6 | 14.04 | 3.16 | 0.37 | 17.58 |
| | SO7 | 21.36 | 4.09 | 0.51 | 25.96 |
| | SO8 | 28.43 | 4.79 | 0.63 | 33.85 |
| | SO9 | 27.52 | 7.00 | 1.55 | 36.06 |

**Table 2: Summary of Mean Costs and Benefits for Case4c Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate**

| Case | SO | Total Cost Savings (2010 U.S. $Billion) | Climate Benefits (2010 U.S. $Billion) | Air Quality Benefits (2010 U.S. $Billion) | Net Cost-Benefit Relative to Baseline (2010 U.S. $Billion) |
|---|---|---|---|---|---|
| Case4c 2020 | SO2 | -0.86 | 0.06 | 0.01 | -0.79 |
| | SO3 | 0.65 | 0.23 | 0.04 | 0.92 |
| | SO4 | 1.28 | 0.33 | 0.05 | 1.67 |
| | SO5 | 2.83 | 0.66 | 0.09 | 3.57 |
| | SO6 | 6.53 | 1.31 | 0.17 | 8.00 |
| | SO7 | 10.52 | 2.04 | 0.27 | 12.83 |
| | SO8 | 13.45 | 2.67 | 0.34 | 16.46 |
| | SO9 | 22.96 | 4.15 | 0.51 | 27.62 |
| | SO10 | 28.03 | 4.98 | 0.57 | 33.58 |

**Table 3: Summary of Mean Costs and Benefits for Hybrid Cases Relative to Baseline Using Midrange Environmental Lens, 3% Environmental Discount Rate, and 0% Total Cost Discount Rate**

| Case | SO | | Total Cost Savings (2010 U.S. $Billion) | Climate Benefits (2010 U.S. $Billion) | Air Quality Benefits (2010 U.S. $Billion) | Net Cost-Benefit Relative to Baseline (2010 U.S. $Billion) |
|---|---|---|---|---|---|---|
| Case | Case4c | Case1 | | | | |
| Hybrid 2023 (Case4c 2020, Case1 2023) | SO4 | SO3 | 9.48 | 1.49 | 0.19 | 11.16 |
| | | SO3 | 8.79 | 1.59 | 0.20 | 10.58 |
| | | SO4 | 7.06 | 1.59 | 0.05 | 8.70 |
| | SO5 | SO3 | 11.63 | 1.91 | 0.24 | 13.79 |
| | | SO4 | 10.11 | 1.95 | 0.10 | 12.16 |
| | | SO5 | 13.75 | 2.54 | 0.35 | 16.65 |
| | SO6 | SO3 | 13.71 | 2.54 | 0.32 | 16.57 |
| | | SO4 | 12.58 | 2.61 | 0.18 | 15.37 |
| | | SO5 | 17.72 | 3.25 | 0.45 | 21.42 |
| | | SO6 | 16.88 | 3.51 | 0.45 | 20.83 |
| | SO7 | SO3 | 19.40 | 3.27 | 0.42 | 23.10 |
| | | SO4 | 18.28 | 3.37 | 0.30 | 21.95 |
| | | SO5 | 22.42 | 4.04 | 0.56 | 27.02 |
| | | SO6 | 22.07 | 4.33 | 0.56 | 26.96 |
| | | SO7 | 25.43 | 4.58 | 0.63 | 30.64 |
| | SO8 | SO3 | 23.66 | 3.61 | 0.44 | 27.70 |
| | | SO4 | 22.82 | 4.05 | 0.35 | 27.22 |
| | | SO5 | 26.19 | 4.65 | 0.63 | 31.47 |
| | | SO6 | 26.30 | 4.98 | 0.63 | 31.92 |
| | | SO7 | 29.70 | 5.23 | 0.69 | 35.62 |
| | | SO8 | 32.94 | 5.37 | 0.77 | 39.08 |
| | SO9 | SO3 | 31.90 | 5.37 | 0.67 | 37.94 |
| | | SO4 | 31.36 | 5.54 | 0.57 | 37.47 |
| | | SO5 | 35.35 | 6.23 | 0.81 | 42.39 |
| | | SO6 | 36.37 | 6.76 | 0.85 | 43.98 |
| | | SO7 | 39.70 | 6.98 | 0.90 | 47.59 |
| | | SO8 | 43.42 | 7.09 | 0.96 | 51.47 |
| | | SO9 | 34.38 | 7.86 | 1.79 | 44.03 |
| | SO10 | SO3 | 35.56 | 6.23 | 0.74 | 42.53 |

CAEP/10-IP/23
**Appendix A**                                                    A-8

| Case | SO | | Total Cost Savings (2010 U.S. $Billion) | Climate Benefits (2010 U.S. $Billion) | Air Quality Benefits (2010 U.S. $Billion) | Net Cost-Benefit Relative to Baseline (2010 U.S. $Billion) |
|------|----|----|------|------|------|------|
| | Case4c | Case1 | | | | |
| | | SO4 | 36.66 | 6.48 | 0.66 | 43.79 |
| | | SO5 | 41.92 | 7.13 | 0.87 | 49.92 |
| | | SO6 | 43.80 | 7.78 | 0.92 | 52.50 |
| | | SO7[2] | 47.27 | 8.11 | 0.99 | 56.37 |
| | | SO8 | 50.99 | 8.16 | 1.04 | 60.19 |
| | | SO9 | 41.95 | 8.93 | 1.88 | 52.76 |
| Hybrid 2025 (Case4c 2020, Case1 2025) | SO3 | SO3 | 7.70 | 1.30 | 0.18 | 9.18 |
| | SO4 | SO3 | 8.37 | 1.40 | 0.18 | 9.96 |
| | | SO4 | 6.89 | 1.41 | 0.07 | 8.37 |
| | SO5 | SO3 | 9.86 | 1.73 | 0.22 | 11.81 |
| | | SO4 | 8.54 | 1.76 | 0.11 | 10.42 |
| | | SO5 | 11.88 | 2.31 | 0.34 | 14.53 |
| | SO6 | SO3 | 13.62 | 2.37 | 0.30 | 16.29 |
| | | SO4 | 12.46 | 2.43 | 0.20 | 15.09 |
| | | SO5 | 16.18 | 2.98 | 0.42 | 19.59 |
| | | SO6 | 15.15 | 3.19 | 0.43 | 18.77 |
| | SO7 | SO3 | 17.62 | 3.11 | 0.40 | 21.13 |
| | | SO4 | 16.62 | 3.19 | 0.31 | 20.11 |
| | | SO5 | 19.68 | 3.74 | 0.52 | 23.94 |
| | | SO6 | 19.06 | 4.00 | 0.54 | 23.60 |
| | | SO7 | 21.81 | 4.21 | 0.59 | 26.62 |
| | SO8 | SO3 | 20.56 | 3.74 | 0.48 | 24.78 |
| | | SO4 | 19.69 | 3.84 | 0.39 | 23.92 |
| | | SO5 | 23.34 | 4.42 | 0.61 | 28.36 |
| | | SO6 | 23.08 | 4.72 | 0.63 | 28.43 |
| | | SO7 | 25.85 | 4.91 | 0.67 | 31.43 |
| | | SO8 | 29.02 | 5.00 | 0.72 | 34.74 |
| | SO9 | SO3 | 30.10 | 5.22 | 0.65 | 35.97 |
| | | SO4 | 29.56 | 5.37 | 0.58 | 35.50 |
| | | SO5 | 33.44 | 5.96 | 0.78 | 40.18 |
| | | SO6 | 34.03 | 6.42 | 0.82 | 41.27 |
| | | SO7 | 36.83 | 6.61 | 0.86 | 44.31 |
| | | SO8 | 40.00 | 6.71 | 0.91 | 47.61 |
| | | SO9 | 31.44 | 7.35 | 1.59 | 40.38 |
| | SO10 | SO3 | 35.17 | 6.10 | 0.72 | 41.99 |
| | | SO4 | 34.87 | 6.31 | 0.66 | 41.84 |
| | | SO5 | 38.95 | 6.94 | 0.86 | 46.74 |
| | | SO6 | 40.25 | 7.50 | 0.91 | 48.66 |
| | | SO7 | 43.06 | 7.70 | 0.95 | 51.71 |
| | | SO8 | 46.23 | 7.79 | 1.00 | 55.01 |
| | | SO9 | 37.67 | 8.44 | 1.68 | 47.79 |

---

[2] Subsequent to generating the climate and air quality results for the Hybrid2023 C4CSO10-C1SO7 scenario, the APMT-I inputs were remodeled by APMT-E and AEDT to correct a transitioning error. Thus, these results are based on inputs that are 1.07 Megatonne higher than the revised APMT-E/AEDT results, which is 0.3% of the change from the baseline values.

3.2                **Total Environmental Benefit Results**

The following figure and tables show only the environmental impacts portions of the CBA. In this section, results are again given for the midrange lens and mid VSL value and are monetized under a 3% discount rate. Figure 2 shows a summary of the results for all cases for which all environmental impacts (climate and air quality) were analyzed. Table 4, Table 5, and Table 6 show the show the underlying data for Figure 2 in tabulated form.

Maximum environmental benefits are attained for each framework case at the most stringent scenario. The overall maximum benefit of just over $11 billion (in 2010 USD) is attained for Case1 2020 SO9.

CAEP/10-IP/23
**Appendix A**                                                                A-10



**Figure 2: Summary of Total Environmental Benefits for All Scenarios Relative to Baseline Using Midrange Lens and 3% Discount Rate**

**Table 4: Summary of Environmental Benefits for Case1 Relative to Baseline Using Midrange Lens and 3% Discount Rate**

| Case | SO | Climate Benefits (2010 U.S. $Billion) | | Air Quality Benefits (2010 U.S. $Billion) | | Total Environmental Benefit (2010 U.S. $Billion) | |
|---|---|---|---|---|---|---|---|
| | | mean | 10-90% | mean | 10-90% | mean | 10-90% |
| Case1 2020 | SO1 | 0.02 | 0.01 0.04 | 0.01 | 0.00 0.01 | 0.03 | 0.01 0.05 |
| | SO2 | 0.08 | 0.03 0.13 | 0.02 | 0.01 0.02 | 0.09 | 0.04 0.15 |
| | SO3 | 1.85 | 0.76 3.11 | 0.23 | 0.14 0.33 | 2.08 | 0.90 3.44 |
| | SO4 | 2.00 | 0.82 3.37 | 0.04 | 0.02 0.07 | 2.04 | 0.84 3.44 |
| | SO5 | 3.16 | 1.30 5.31 | 0.43 | 0.26 0.61 | 3.59 | 1.56 5.92 |
| | SO6 | 4.26 | 1.75 7.16 | 0.53 | 0.32 0.75 | 4.80 | 2.07 7.92 |
| | SO7 | 5.44 | 2.23 9.14 | 0.72 | 0.43 1.01 | 6.16 | 2.66 10.15 |
| | SO8 | 6.28 | 2.57 10.54 | 0.87 | 0.53 1.22 | 7.14 | 3.10 11.76 |
| | SO9 | 8.94 | 3.67 15.02 | 2.10 | 1.27 2.98 | 11.04 | 4.94 18.00 |
| Case1 2023 | SO1 | 0.02 | 0.01 0.03 | 0.00 | 0.00 0.01 | 0.02 | 0.01 0.04 |
| | SO2 | 0.06 | 0.03 0.10 | 0.01 | 0.01 0.02 | 0.07 | 0.03 0.12 |
| | SO3 | 1.37 | 0.57 2.31 | 0.16 | 0.10 0.23 | 1.53 | 0.67 2.54 |
| | SO4 | 1.46 | 0.61 2.45 | 0.03 | 0.01 0.05 | 1.49 | 0.62 2.50 |
| | SO5 | 2.36 | 0.99 3.96 | 0.31 | 0.19 0.44 | 2.67 | 1.17 4.39 |
| | SO6 | 3.16 | 1.32 5.32 | 0.37 | 0.22 0.52 | 3.53 | 1.55 5.84 |
| | SO7 | 4.09 | 1.71 6.87 | 0.51 | 0.31 0.73 | 4.60 | 2.02 7.59 |
| | SO8 | 4.79 | 2.00 8.06 | 0.63 | 0.38 0.89 | 5.42 | 2.39 8.95 |
| | SO9 | 7.00 | 2.92 11.73 | 1.55 | 0.93 2.19 | 8.54 | 3.86 13.92 |

CAEP/10-IP/23
**Appendix A**                                            A-12

**Table 5: Summary of Environmental Benefits for Case4c Relative to Baseline Using Midrange Lens and 3% Discount Rate**

| Case | SO | Climate Benefits (2010 U.S. $Billion) | | Air Quality Benefits (2010 U.S. $Billion) | | Total Environmental Benefit (2010 U.S. $Billion) | |
|---|---|---|---|---|---|---|---|
| | | mean | 10-90% | mean | 10-90% | mean | 10-90% |
| Case4c 2020 | SO2 | 0.06 | 0.02 0.09 | 0.01 | 0.01 0.02 | 0.07 | 0.03 0.11 |
| | SO3 | 0.23 | 0.09 0.39 | 0.04 | 0.02 0.06 | 0.27 | 0.12 0.44 |
| | SO4 | 0.33 | 0.13 0.56 | 0.05 | 0.03 0.08 | 0.39 | 0.17 0.63 |
| | SO5 | 0.66 | 0.27 1.10 | 0.09 | 0.06 0.13 | 0.75 | 0.32 1.23 |
| | SO6 | 1.31 | 0.53 2.19 | 0.17 | 0.10 0.24 | 1.47 | 0.63 2.43 |
| | SO7 | 2.04 | 0.83 3.42 | 0.27 | 0.16 0.37 | 2.30 | 0.99 3.80 |
| | SO8 | 2.67 | 1.08 4.48 | 0.34 | 0.21 0.48 | 3.01 | 1.29 4.96 |
| | SO9 | 4.15 | 1.68 6.97 | 0.51 | 0.31 0.71 | 4.66 | 1.99 7.68 |
| | SO10 | 4.98 | 2.02 8.37 | 0.57 | 0.35 0.80 | 5.55 | 2.37 9.17 |

**Table 6: Summary of Environmental Benefits for Hybrid Cases Relative to Baseline Using Midrange Lens and 3% Discount Rate**

| Case | SO | | Climate Benefits (2010 U.S. $Billion) | | Air Quality Benefits (2010 U.S. $Billion) | | Total Environmental Benefit (2010 U.S. $Billion) | |
|---|---|---|---|---|---|---|---|---|
| | Case4c | Case1 | mean | 10-90% | mean | 10-90% | mean | 10-90% |
| Hybrid 2023 (Case4c 2020, Case1 2023) | SO3 | SO3 | 1.49 | 0.61 2.53 | 0.19 | 0.12 0.27 | 1.68 | 0.72 2.80 |
| | SO4 | SO3 | 1.59 | 0.65 2.71 | 0.20 | 0.12 0.29 | 1.79 | 0.78 3.00 |
| | | SO4 | 1.59 | 0.65 2.72 | 0.05 | 0.03 0.07 | 1.64 | 0.68 2.79 |
| | SO5 | SO3 | 1.91 | 0.78 3.26 | 0.24 | 0.15 0.34 | 2.15 | 0.93 3.60 |
| | | SO4 | 1.95 | 0.80 3.32 | 0.10 | 0.06 0.14 | 2.04 | 0.85 3.46 |
| | | SO5 | 2.54 | 1.04 4.31 | 0.35 | 0.21 0.50 | 2.89 | 1.25 4.81 |
| | SO6 | SO3 | 2.54 | 1.04 4.32 | 0.32 | 0.19 0.45 | 2.86 | 1.23 4.77 |
| | | SO4 | 2.61 | 1.07 4.44 | 0.18 | 0.11 0.26 | 2.79 | 1.18 4.70 |
| | | SO5 | 3.25 | 1.33 5.51 | 0.45 | 0.27 0.63 | 3.70 | 1.60 6.14 |

| Case | SO | | Climate Benefits (2010 U.S. $Billion) | | Air Quality Benefits (2010 U.S. $Billion) | | Total Environmental Benefit (2010 U.S. $Billion) | |
|---|---|---|---|---|---|---|---|---|
| | Case4c | Case1 | mean | 10-90% | mean | 10-90% | mean | 10-90% |
| | | SO6 | 3.51 | 1.44 5.98 | 0.45 | 0.27 0.64 | 3.95 | 1.71 6.61 |
| | SO7 | SO3 | 3.27 | 1.34 5.57 | 0.42 | 0.26 0.60 | 3.70 | 1.60 6.16 |
| | | SO4 | 3.37 | 1.38 5.74 | 0.30 | 0.18 0.41 | 3.66 | 1.56 6.16 |
| | | SO5 | 4.04 | 1.65 6.84 | 0.56 | 0.34 0.79 | 4.59 | 1.99 7.63 |
| | | SO6 | 4.33 | 1.77 7.36 | 0.56 | 0.34 0.79 | 4.89 | 2.11 8.16 |
| | | SO7 | 4.58 | 1.88 7.80 | 0.63 | 0.38 0.88 | 5.21 | 2.26 8.68 |
| | SO8 | SO3 | 3.61 | 1.48 6.14 | 0.44 | 0.27 0.62 | 4.05 | 1.74 6.75 |
| | | SO4 | 4.05 | 1.66 6.89 | 0.35 | 0.21 0.50 | 4.40 | 1.87 7.39 |
| | | SO5 | 4.65 | 1.91 7.89 | 0.63 | 0.38 0.89 | 5.28 | 2.29 8.77 |
| | | SO6 | 4.98 | 2.04 8.47 | 0.63 | 0.38 0.89 | 5.61 | 2.42 9.37 |
| | | SO7 | 5.23 | 2.14 8.89 | 0.69 | 0.42 0.98 | 5.92 | 2.56 9.87 |
| | | SO8 | 5.37 | 2.20 9.14 | 0.77 | 0.47 1.08 | 6.14 | 2.67 10.21 |
| | SO9 | SO3 | 5.37 | 2.20 9.10 | 0.67 | 0.41 0.95 | 6.04 | 2.61 10.05 |
| | | SO4 | 5.54 | 2.27 9.43 | 0.57 | 0.35 0.80 | 6.12 | 2.62 10.23 |
| | | SO5 | 6.23 | 2.55 10.55 | 0.81 | 0.49 1.15 | 7.04 | 3.04 11.70 |
| | | SO6 | 6.76 | 2.77 11.48 | 0.85 | 0.52 1.20 | 7.62 | 3.29 12.68 |
| | | SO7 | 6.98 | 2.86 11.85 | 0.90 | 0.55 1.28 | 7.88 | 3.41 13.12 |
| | | SO8 | 7.09 | 2.91 12.03 | 0.96 | 0.58 1.35 | 8.05 | 3.49 13.38 |
| | | SO9 | 7.86 | 3.22 13.32 | 1.79 | 1.09 2.54 | 9.65 | 4.31 15.86 |
| | SO10 | SO3 | 6.23 | 2.56 10.56 | 0.74 | 0.45 1.04 | 6.96 | 3.00 11.59 |
| | | SO4 | 6.48 | 2.66 11.00 | 0.66 | 0.40 0.92 | 7.13 | 3.06 11.92 |
| | | SO5 | 7.13 | 2.92 12.09 | 0.87 | 0.52 1.22 | 8.00 | 3.45 13.31 |
| | | SO6 | 7.78 | 3.19 13.20 | 0.92 | 0.56 1.30 | 8.70 | 3.75 14.50 |
| | | SO7[2] | 8.11 | 3.33 13.76 | 0.99 | 0.60 1.39 | 9.10 | 3.93 15.16 |

CAEP/10-IP/23
**Appendix A**                                         A-14

| Case | SO | | Climate Benefits (2010 U.S. $Billion) | | Air Quality Benefits (2010 U.S. $Billion) | | Total Environmental Benefit (2010 U.S. $Billion) | |
|---|---|---|---|---|---|---|---|---|
| | Case4c | Case1 | mean | 10-90% | mean | 10-90% | mean | 10-90% |
| | | SO8 | 8.16 | 3.35 13.84 | 1.04 | 0.63 1.46 | 9.20 | 3.98 15.31 |
| | | SO9 | 8.93 | 3.66 15.14 | 1.88 | 1.14 2.66 | 10.81 | 4.80 17.80 |
| Hybrid 2025 (Case4c 2020, Case1 2025) | SO3 | SO3 | 1.30 | 0.53 2.19 | 0.18 | 0.11 0.26 | 1.48 | 0.64 2.45 |
| | SO4 | SO3 | 1.40 | 0.57 2.36 | 0.18 | 0.11 0.26 | 1.59 | 0.68 2.62 |
| | | SO4 | 1.41 | 0.57 2.38 | 0.07 | 0.04 0.09 | 1.48 | 0.61 2.47 |
| | SO5 | SO3 | 1.73 | 0.70 2.91 | 0.22 | 0.13 0.31 | 1.95 | 0.83 3.22 |
| | | SO4 | 1.76 | 0.71 2.97 | 0.11 | 0.07 0.16 | 1.87 | 0.78 3.12 |
| | | SO5 | 2.31 | 0.93 3.89 | 0.34 | 0.21 0.49 | 2.65 | 1.14 4.38 |
| | SO6 | SO3 | 2.37 | 0.96 3.99 | 0.30 | 0.18 0.42 | 2.67 | 1.14 4.41 |
| | | SO4 | 2.43 | 0.98 4.09 | 0.20 | 0.12 0.28 | 2.63 | 1.10 4.36 |
| | | SO5 | 2.98 | 1.21 5.02 | 0.42 | 0.25 0.60 | 3.40 | 1.46 5.62 |
| | | SO6 | 3.19 | 1.29 5.37 | 0.43 | 0.26 0.60 | 3.62 | 1.55 5.97 |
| | SO7 | SO3 | 3.11 | 1.26 5.23 | 0.40 | 0.24 0.57 | 3.51 | 1.50 5.79 |
| | | SO4 | 3.19 | 1.29 5.36 | 0.31 | 0.19 0.43 | 3.49 | 1.48 5.79 |
| | | SO5 | 3.74 | 1.52 6.30 | 0.52 | 0.32 0.74 | 4.27 | 1.83 7.05 |
| | | SO6 | 4.00 | 1.62 6.74 | 0.54 | 0.32 0.76 | 4.54 | 1.95 7.50 |
| | | SO7 | 4.21 | 1.71 7.09 | 0.59 | 0.36 0.83 | 4.80 | 2.06 7.92 |
| | SO8 | SO3 | 3.74 | 1.52 6.29 | 0.48 | 0.29 0.68 | 4.22 | 1.81 6.97 |
| | | SO4 | 3.84 | 1.56 6.46 | 0.39 | 0.24 0.55 | 4.23 | 1.79 7.01 |
| | | SO5 | 4.42 | 1.79 7.44 | 0.61 | 0.37 0.86 | 5.03 | 2.16 8.30 |
| | | SO6 | 4.72 | 1.91 7.96 | 0.63 | 0.38 0.88 | 5.35 | 2.29 8.84 |
| | | SO7 | 4.91 | 1.99 8.26 | 0.67 | 0.41 0.95 | 5.58 | 2.39 9.21 |
| | | SO8 | 5.00 | 2.03 8.42 | 0.72 | 0.44 1.01 | 5.72 | 2.46 9.43 |
| | SO9 | SO3 | 5.22 | 2.12 8.79 | 0.65 | 0.40 0.91 | 5.87 | 2.51 9.70 |

A-15

| Case | SO | | Climate Benefits (2010 U.S. $Billion) | | Air Quality Benefits (2010 U.S. $Billion) | | Total Environmental Benefit (2010 U.S. $Billion) | |
|---|---|---|---|---|---|---|---|---|
| | Case4c | Case1 | mean | 10-90% | mean | 10-90% | mean | 10-90% |
| | | SO4 | 5.37 | 2.18 9.04 | 0.58 | 0.35 0.81 | 5.94 | 2.53 9.85 |
| | | SO5 | 5.96 | 2.41 10.04 | 0.78 | 0.47 1.11 | 6.75 | 2.89 11.15 |
| | | SO6 | 6.42 | 2.61 10.82 | 0.82 | 0.49 1.16 | 7.24 | 3.10 11.97 |
| | | SO7 | 6.61 | 2.68 11.14 | 0.86 | 0.52 1.22 | 7.48 | 3.20 12.36 |
| | | SO8 | 6.71 | 2.72 11.30 | 0.91 | 0.55 1.28 | 7.62 | 3.27 12.57 |
| | | SO9 | 7.35 | 2.98 12.39 | 1.59 | 0.96 2.26 | 8.95 | 3.94 14.65 |
| | | SO3 | 6.10 | 2.47 10.27 | 0.72 | 0.44 1.01 | 6.82 | 2.91 11.29 |
| | | SO4 | 6.31 | 2.56 10.62 | 0.66 | 0.40 0.93 | 6.97 | 2.96 11.55 |
| | | SO5 | 6.94 | 2.81 11.68 | 0.86 | 0.52 1.22 | 7.80 | 3.33 12.90 |
| | SO10 | SO6 | 7.50 | 3.04 12.64 | 0.91 | 0.55 1.28 | 8.41 | 3.59 13.92 |
| | | SO7 | 7.70 | 3.12 12.97 | 0.95 | 0.58 1.35 | 8.65 | 3.70 14.31 |
| | | SO8 | 7.79 | 3.16 13.12 | 1.00 | 0.61 1.40 | 8.79 | 3.77 14.52 |
| | | SO9 | 8.44 | 3.41 14.21 | 1.68 | 1.02 2.38 | 10.12 | 4.43 16.60 |

CAEP/10-IP/23
**Appendix A**                                                A-16

## 4.   RESULTS BY IMPACT TYPE

This section presents monetized results for the environmental domains of climate and air quality.

### 4.1          **Climate**

The following figures show the climate benefits of the various scenarios under consideration by CAEP. All figures here are for a midrange lens (defined in CAEP/10-IP/24, Appendix A, Section 4.4) and a 3% discount rate. The heights of the bars represent the mean results, and the error bars represent the 10th and 90th percentile Monte Carlo results. The figures show increasing benefits associated with higher SOs across all scenarios. Since the proposed $CO_2$ SOs are designed to reduce climate impacts, this is also the expected trend. Figure 3 shows a summary of the data for all scenarios. Figure 4 shows the results for Case1 2020, 2023, 2025, and 2028; Figure 5 shows the results for Case4c 2020 and 2023; Figure 6 shows the results for Hybrid 2023; and Figure 7 shows the results for Hybrid 2025. For non-GHG climate forcers, reducing emissions only in the United States could accentuate the non-linearities and inhomogeneities discussed in [CAEP/10-IP/24, Appendix A, Section 2.1.1].

A-17



**Figure 3: Summary of Climate Benefits for All Scenarios Relative to Baseline Using Midrange Lens and 3% Discount Rate**

2019-003083-1282

CAEP/10-IP/23
Appendix A                                                A-18



**Figure 4: Climate Benefits for Case1 Relative to Baseline Using Midrange Lens and 3% Discount Rate**

A-19

CAEP/10-IP/23
**Appendix A**



**Figure 5: Climate Benefits for Case4c Relative to Baseline Using Midrange Lens and 3% Discount Rate**

CAEP/10-IP/23
**Appendix A**                                                    A-20



**Figure 6: Climate Benefits for Hybrid 2023 Relative to Baseline Using Midrange Lens and 3% Discount Rate**



**Figure 7: Climate Benefits for Hybrid 2025 Relative to Baseline Using Midrange Lens and 3% Discount Rate**

## 4.2        Air Quality

The following figures show the monetized air quality impacts of the various scenarios under consideration by CAEP. All figures here are for the mid VSL (defined in CAEP/10-IP/24, Appendix A, Section 4.4) and a 3% discount rate. The heights of the bars represent the mean results, and the error bars represent the 10th and 90th percentile Monte Carlo results. Figure 8 shows a summary of the data for all scenarios. Figure 9

CAEP/10-IP/23
**Appendix A**                              A-22

shows the results for Case1 2020 and 2023; Figure 10 shows the results for Case4c 2020; Figure 11 shows the results for Hybrid 2023; and Figure 12 shows the results for Hybrid 2025.



**Figure 8: Summary of Air Quality Benefits for All Scenarios Relative to Baseline Using Midrange VSL and 3% Discount Rate**



**Figure 9: Air Quality Benefits for Case1 Relative to Baseline Using Midrange VSL and 3% Discount Rate**

CAEP/10-IP/23
**Appendix A**                                                    A-24



**Figure 10: Air Quality Benefits for Case4c Relative to Baseline Using Midrange VSL and 3% Discount Rate**

A-25



**Figure 11: Air Quality Benefits for Hybrid 2023 Relative to Baseline Using Midrange VSL and 3% Discount Rate**

CAEP/10-IP/23
Appendix A                                        A-26



**Figure 12: Air Quality Benefits for Hybrid 2025 Relative to Baseline Using Midrange VSL and 3% Discount Rate**

## 5. CLIMATE BENEFITS COMPUTED USING UNITED STATES GOVERNMENT (USG) SOCIAL COST OF CARBON (SCC) METHOD

This section presents monetized climate benefits computed using the USG's SCC method. In this method, the $CO_2$ saved is monetized by applying four discrete SCC values, as detailed in CAEP/10-IP/24, Appendix A, Section 2.1.1. The results of this analysis are shown in Figure 13 and Table 7-Table 9 below.

Figure 13 includes results from the APMT-I climate analysis in addition to the results from the four SCC values, to allow for comparison of the SCC results to the APMT-I climate benefits included in the CBA presented in Section 3.1.

The trends between the climate benefits of different scenarios as calculated with the SCC values are the same as the trends using APMT-I. The results from the APMT-I Climate Model using a midrange lens and 3% discount rate are similar to those from the 2.5% discount rate SCC analysis.

CAEP/10-IP/23
Appendix A                                          A-28



**Figure 13: Summary of Climate Benefits for All Scenarios Relative to Baseline Using SCC 2.5%, 3%, and 5% Discount Rates, SCC 95th Percentile, and APMT-I Midrange Lens (with a 3% Discount Rate)**

**Table 7: Summary of SCC-Calculated Climate Impacts for Case1 Relative to Baseline**

| Case | SO | 2.5% Discount Rate (2010 U.S. $Billion) | 3% Discount Rate (2010 U.S. $Billion) | 5% Discount Rate (2010 U.S. $Billion) | 95th Percentile (2010 U.S. $Billion) |
|------|-----|-------|-------|-------|--------|
| Case1 2020 | SO1 | 0.022 | 0.014 | 0.003 | 0.042 |
| | SO2 | 0.074 | 0.046 | 0.010 | 0.140 |
| | SO3 | 1.814 | 1.130 | 0.235 | 3.430 |
| | SO4 | 1.985 | 1.237 | 0.258 | 3.754 |
| | SO5 | 3.039 | 1.893 | 0.394 | 5.746 |
| | SO6 | 4.164 | 2.594 | 0.540 | 7.874 |
| | SO7 | 5.300 | 3.301 | 0.687 | 10.022 |
| | SO8 | 6.100 | 3.800 | 0.791 | 11.536 |
| | SO9 | 8.610 | 5.363 | 1.116 | 16.282 |
| Case1 2023 | SO1 | 0.017 | 0.011 | 0.002 | 0.033 |
| | SO2 | 0.058 | 0.036 | 0.007 | 0.110 |
| | SO3 | 1.337 | 0.832 | 0.172 | 2.527 |
| | SO4 | 1.439 | 0.895 | 0.185 | 2.720 |
| | SO5 | 2.242 | 1.395 | 0.288 | 4.239 |
| | SO6 | 3.064 | 1.906 | 0.394 | 5.794 |
| | SO7 | 3.945 | 2.454 | 0.506 | 7.458 |
| | SO8 | 4.616 | 2.872 | 0.593 | 8.728 |
| | SO9 | 6.677 | 4.153 | 0.857 | 12.623 |
| Case1 2025 | SO1 | 0.014 | 0.008 | 0.002 | 0.026 |
| | SO2 | 0.047 | 0.029 | 0.006 | 0.089 |
| | SO3 | 1.059 | 0.658 | 0.135 | 2.002 |
| | SO4 | 1.148 | 0.713 | 0.146 | 2.170 |
| | SO5 | 1.805 | 1.121 | 0.230 | 3.412 |
| | SO6 | 2.484 | 1.543 | 0.316 | 4.695 |
| | SO7 | 3.224 | 2.003 | 0.411 | 6.095 |
| | SO8 | 3.773 | 2.345 | 0.481 | 7.133 |
| | SO9 | 5.508 | 3.422 | 0.702 | 10.411 |
| Case1 2028 | SO1 | 0.009 | 0.005 | 0.001 | 0.016 |
| | SO2 | 0.032 | 0.020 | 0.004 | 0.060 |
| | SO3 | 0.718 | 0.446 | 0.091 | 1.358 |
| | SO4 | 0.785 | 0.487 | 0.099 | 1.484 |
| | SO5 | 1.240 | 0.769 | 0.156 | 2.344 |
| | SO6 | 1.737 | 1.078 | 0.219 | 3.284 |
| | SO7 | 2.282 | 1.416 | 0.288 | 4.315 |
| | SO8 | 2.683 | 1.665 | 0.338 | 5.073 |
| | SO9 | 3.907 | 2.424 | 0.492 | 7.387 |

CAEP/10-IP/23
Appendix A                                                    A-30

**Table 8: Summary of SCC-Calculated Climate Impacts for Case4c Relative to Baseline**

| Case | SO | 2.5% Discount Rate (2010 U.S. $Billion) | 3% Discount Rate (2010 U.S. $Billion) | 5% Discount Rate (2010 U.S. $Billion) | 95th Percentile (2010 U.S. $Billion) |
|---|---|---|---|---|---|
| Case4c 2020 | SO2 | 0.056 | 0.035 | 0.007 | 0.106 |
| | SO3 | 0.229 | 0.143 | 0.030 | 0.433 |
| | SO4 | 0.329 | 0.205 | 0.043 | 0.623 |
| | SO5 | 0.655 | 0.408 | 0.085 | 1.238 |
| | SO6 | 1.295 | 0.807 | 0.168 | 2.448 |
| | SO7 | 2.018 | 1.258 | 0.262 | 3.817 |
| | SO8 | 2.641 | 1.645 | 0.343 | 4.994 |
| | SO9 | 4.103 | 2.556 | 0.533 | 7.759 |
| | SO10 | 4.917 | 3.064 | 0.638 | 9.299 |
| Case4c 2023 | SO2 | 0.043 | 0.027 | 0.005 | 0.081 |
| | SO3 | 0.179 | 0.111 | 0.023 | 0.338 |
| | SO4 | 0.255 | 0.159 | 0.033 | 0.482 |
| | SO5 | 0.504 | 0.313 | 0.065 | 0.952 |
| | SO6 | 1.008 | 0.627 | 0.129 | 1.905 |
| | SO7 | 1.576 | 0.981 | 0.202 | 2.980 |
| | SO8 | 2.069 | 1.287 | 0.265 | 3.911 |
| | SO9 | 3.232 | 2.010 | 0.415 | 6.110 |
| | SO10 | 3.884 | 2.416 | 0.498 | 7.342 |

**Table 9: Summary of SCC-Calculated Climate Impacts for Hybrid Cases Relative to Baseline**

| Case | SO Case4c | SO Case1 | 2.5% Discount Rate (2010 U.S. $Billion) | 3% Discount Rate (2010 U.S. $Billion) | 5% Discount Rate (2010 U.S. $Billion) | 95th Percentile (2010 U.S. $Billion) |
|---|---|---|---|---|---|---|
| Hybrid 2023 (Case4c 2020, Case1 2023) | SO3 | SO3 | 1.471 | 0.916 | 0.191 | 2.782 |
| | SO4 | SO3 | 1.572 | 0.979 | 0.204 | 2.972 |
| | | SO4 | 1.598 | 0.995 | 0.207 | 3.022 |
| | SO5 | SO3 | 1.892 | 1.179 | 0.245 | 3.578 |
| | | SO4 | 1.948 | 1.213 | 0.252 | 3.683 |
| | | SO5 | 2.470 | 1.538 | 0.320 | 4.670 |
| | SO6 | SO3 | 2.511 | 1.564 | 0.326 | 4.749 |
| | | SO4 | 2.602 | 1.621 | 0.337 | 4.921 |
| | | SO5 | 3.164 | 1.970 | 0.410 | 5.983 |
| | | SO6 | 3.464 | 2.158 | 0.449 | 6.551 |
| | SO7 | SO3 | 3.241 | 2.019 | 0.420 | 6.129 |
| | | SO4 | 3.352 | 2.088 | 0.435 | 6.339 |
| | | SO5 | 3.940 | 2.454 | 0.511 | 7.451 |
| | | SO6 | 4.273 | 2.661 | 0.554 | 8.080 |
| | | SO7 | 4.520 | 2.815 | 0.585 | 8.547 |
| | SO8 | SO3 | 3.571 | 2.224 | 0.463 | 6.753 |
| | | SO4 | 4.017 | 2.502 | 0.521 | 7.596 |
| | | SO5 | 4.546 | 2.832 | 0.589 | 8.598 |
| | | SO6 | 4.914 | 3.061 | 0.637 | 9.292 |
| | | SO7 | 5.151 | 3.208 | 0.667 | 9.741 |
| | | SO8 | 5.293 | 3.297 | 0.686 | 10.009 |
| | SO9 | SO3 | 5.309 | 3.307 | 0.689 | 10.039 |

| Case | SO | | 2.5% Discount Rate (2010 U.S. $Billion) | 3% Discount Rate (2010 U.S. $Billion) | 5% Discount Rate (2010 U.S. $Billion) | 95th Percentile (2010 U.S. $Billion) |
|---|---|---|---|---|---|---|
| | Case4c | Case1 | | | | |
| | | SO4 | 5.499 | 3.426 | 0.713 | 10.400 |
| | | SO5 | 6.102 | 3.801 | 0.791 | 11.540 |
| | | SO6 | 6.668 | 4.153 | 0.864 | 12.609 |
| | | SO7 | 6.878 | 4.284 | 0.891 | 13.007 |
| | | SO8 | 6.986 | 4.351 | 0.905 | 13.211 |
| | | SO9 | 7.685 | 4.787 | 0.996 | 14.532 |
| | SO10 | SO3 | 6.146 | 3.829 | 0.797 | 11.622 |
| | | SO4 | 6.407 | 3.992 | 0.831 | 12.117 |
| | | SO5 | 6.986 | 4.352 | 0.906 | 13.211 |
| | | SO6 | 7.659 | 4.770 | 0.992 | 14.483 |
| | | SO7[2] | 7.976 | 4.968 | 1.033 | 15.083 |
| | | SO8 | 8.022 | 4.996 | 1.039 | 15.170 |
| | | SO9 | 8.726 | 5.435 | 1.130 | 16.501 |
| Hybrid 2025 (Case4c 2020, Case1 2025) | SO3 | SO3 | 1.272 | 0.792 | 0.164 | 2.406 |
| | SO4 | SO3 | 1.374 | 0.856 | 0.178 | 2.598 |
| | | SO4 | 1.401 | 0.872 | 0.181 | 2.649 |
| | SO5 | SO3 | 1.694 | 1.055 | 0.219 | 3.204 |
| | | SO4 | 1.745 | 1.087 | 0.226 | 3.299 |
| | | SO5 | 2.219 | 1.382 | 0.287 | 4.196 |
| | SO6 | SO3 | 2.326 | 1.449 | 0.301 | 4.398 |
| | | SO4 | 2.399 | 1.494 | 0.311 | 4.536 |
| | | SO5 | 2.875 | 1.791 | 0.372 | 5.437 |
| | | SO6 | 3.125 | 1.946 | 0.404 | 5.910 |
| | SO7 | SO3 | 3.046 | 1.898 | 0.395 | 5.761 |
| | | SO4 | 3.141 | 1.957 | 0.407 | 5.941 |
| | | SO5 | 3.622 | 2.256 | 0.469 | 6.850 |
| | | SO6 | 3.918 | 2.440 | 0.507 | 7.410 |
| | | SO7 | 4.120 | 2.565 | 0.533 | 7.790 |
| | SO8 | SO3 | 3.665 | 2.283 | 0.475 | 6.930 |
| | | SO4 | 3.779 | 2.354 | 0.490 | 7.145 |
| | | SO5 | 4.286 | 2.669 | 0.555 | 8.104 |
| | | SO6 | 4.623 | 2.879 | 0.598 | 8.742 |
| | | SO7 | 4.799 | 2.988 | 0.621 | 9.074 |
| | | SO8 | 4.888 | 3.044 | 0.632 | 9.243 |
| | SO9 | SO3 | 5.117 | 3.187 | 0.664 | 9.676 |
| | | SO4 | 5.276 | 3.287 | 0.684 | 9.977 |
| | | SO5 | 5.795 | 3.610 | 0.751 | 10.959 |
| | | SO6 | 6.279 | 3.911 | 0.813 | 11.873 |
| | | SO7 | 6.460 | 4.023 | 0.836 | 12.216 |
| | | SO8 | 6.551 | 4.080 | 0.848 | 12.388 |
| | | SO9 | 7.135 | 4.444 | 0.924 | 13.493 |
| | SO10 | SO3 | 5.971 | 3.720 | 0.774 | 11.292 |
| | | SO4 | 6.184 | 3.852 | 0.802 | 11.694 |
| | | SO5 | 6.738 | 4.197 | 0.873 | 12.742 |
| | | SO6 | 7.318 | 4.558 | 0.948 | 13.838 |
| | | SO7 | 7.507 | 4.675 | 0.972 | 14.196 |
| | | SO8 | 7.594 | 4.730 | 0.983 | 14.361 |
| | | SO9 | 8.183 | 5.096 | 1.059 | 15.474 |

CAEP/10-IP/23
**Appendix A**                                              A-32

## 6.  SENSITIVITY TO MAJOR ASSUMPTIONS

This section contains United States-only results, with limited explanations of those results. For additional background on the results and plots included here, see CAEP/10-IP/24, Appendix A, Section 8.

6.1                    **Environmental Discount Rate Analysis**

For this sensitivity analysis, the discount rate was only changed for environmental impacts results. See CAEP/10-IP/24, Appendix A, Section 8.1 for additional information.

Figure 14 shows the results of a discount rate sensitivity test for APMT-I Climate impacts using discount rates of 2%, 3%, and 7% for one framework case. As mentioned in CAEP/10-IP/24, Appendix A, Section 4.4, although these are not the discount rates recommended by a United States interagency working group (IWG) (see CAEP/10-IP/24, Appendix A, Section 2.1.1), the analyzed discount rates span the IWG recommendation and results with respect to any intermediate discount rates (including the IWG-recommended values) can be approximated through interpolation. The low discount rate shows a ~80% increase in benefits on average relative to the mid discount rate, and the high discount rate shows a ~75% decrease on average relative to the mid discount rate. The percentage changes are almost identical to those seen in the corresponding global sensitivity analysis.



**Figure 14: Discount Rate Sensitivity: Climate Benefits for Case1 2023 Relative to Baseline Using Midrange Lens**

Figure 15 shows the results of a discount rate sensitivity test for air quality impacts using discount rates of 2%, 3%, and 7% for one framework case. As expected, the low discount rate shows a ~25% increase in benefits relative the mid discount rate, and the high discount rate shows a ~60% decrease relative to the mid discount rate. These percentage changes are within a few percent of the changes seen in the corresponding global sensitivity analysis.

CAEP/10-IP/23
**Appendix A**                                          A-34



**Figure 15: Discount Rate Sensitivity: Air Quality Benefits for Case1 2023 Relative to Baseline Using Midrange VSL**

Figure 16 shows the sensitivity of the net cost-benefit to environmental discount rate. For the Case1 2023 example shown below, almost all SOs show the same trend regardless of discount rate assumption, with the exception of the high discount rate for SO9, which shows results nearly identical to those for SO8.



**Figure 16: Discount Rate Sensitivity: Net Cost-Benefit for Case1 2023 Relative to Baseline Using Midrange Environmental Lens and 0% Total Cost Discount Rate**

6.2        **Lens Analysis**

Figure 17 shows the climate impacts under different lens assumptions. As can be seen in this graph, the climate model shows significant changes based on what lens assumptions are used. The low lens shows a more than 95% decrease in benefits relative to the mid lens in all cases, and the high lens shows ~2.4 times greater benefits than the mid lens. The percentage changes are within a few percent of the changes seen in the corresponding global sensitivity analysis.

CAEP/10-IP/23
**Appendix A**                                           A-36



**Figure 17: Lens Sensitivity: Climate Benefits for Case1 2023 Relative to Baseline Using 3% Discount Rate**

Figure 18 shows the impact of the low, mid, and high VSL assumptions on air quality results. The low VSL shows a ~45% decrease in benefits relative to the mid VSL, and the high VSL shows ~40% greater benefits than the mid VSL. These percentage changes are identical to the changes seen in the global sensitivity analysis.



**Figure 18: VSL Sensitivity: Air Quality Benefits for Case1 2023 Relative to Baseline Using 3% Discount Rate**

Figure 19 shows the sensitivity of cost-benefit results to climate lens assumptions and air quality VSL assumption. Almost all SOs show the same trend regardless of lens assumption, with the exception of the low lens for SO9, which shows a slight decrease relative to SO8. These are the same trends seen in the corresponding global sensitivity analysis.

CAEP/10-IP/23
**Appendix A**                              A-38



**Figure 19: Lens Sensitivity: Net Cost-Benefit for Case1 2023 Relative to Baseline Using 3%
Environmental Discount Rate and 0% Total Cost Discount Rate**

# 7.  REFERENCES

[1]  Rojo, J. J., "Future trends in local air quality impacts of aviation," S.M. Thesis, Department of Aeronautics and Astronautics, Massachusetts Institute of Technology, Cambridge, MA, 2007.

[2]  Sequeira, C.J., "An Assessment of the Health Implications of Aviation Emissions Regulations," S.M. Thesis, Department of Aeronautics and Astronautics, Massachusetts Institute of Technology, Cambridge, MA, 2008.

[3]  Ratliff, G., C. Sequeira, I.A. Waitz, M. Ohsfeldt, T. Thrasher, M. Graham, and T. Thompson, "Aircraft Impacts on Local and Regional Air Quality in the United States: PARTNER Project 15 final report," PARTNER-COE-2009-002, October 2009. http://web.mit.edu/aeroastro/partner/projects/project15.html

[4]  Watkiss, P., S. Pye, and M. Holland, "Baseline Scenarios for Service Contract for carrying out cost-benefits analysis of air quality related issues, in particular in the clean air for Europe (CAFE) program," AEA Technology Environment, 2005.

[5]  Krewski, D., M. Jerret, R.T. Burnett, R. Ma, E. Hughes, Y. Shi, et al. (2009).  Extended follow-up and spatial analysis of the American Cancer Society study linking particulate air pollution and mortality. HEI Research Report, 140,Health Effects Institute, Boston, MA.

[6]  Lepeule J, Laden F, Dockery D, Schwartz J. 2012. Chronic Exposure to Fine Particles and Mortality: An Extended Follow-Up of the Harvard Six Cities Study from 1974 to 2009. Environ Health Perspect. Jul;120(7):965-70.

[7]  EPA *Guidelines for Preparing Economic Analyses*, available at http://yosemite.epa.gov/EE%5Cepa%5Ceed.nsf/webpages/guidelines.html#download.

[8]  Ashok, A., "The Air Quality Impact of Aviation in Future-Year Emissions Scenarios," Masters of Science Thesis, Department of Aeronautics and Astronautics, Massachusetts Institute of Technology, Cambridge, MA, September, 2011.

[9]  Woody, M., B.H., Baek, Z., Adelman, M., Omary, Y.F., Lam, J.J., West, S., Arunachalam, "An assessment of Aviation's contribution to current and future fine particulate matter in the United States." Atmospheric Environment, 45: 2011.

[10]  Masek, T., "A Response Surface Model of the Air Quality Impacts of Aviation," Masters of Science Thesis, Department of Aeronautics and Astronautics, Massachusetts Institute of Technology, Cambridge, MA, June, 2008.

[11]  Brunelle-Yeung, E. "The Impacts of Aviation Emissions on Human Health through Changes in Air Quality and UV Irradiance," Masters of Science Thesis, Department of Aeronautics and Astronautics, Massachusetts Institute of Technology, Cambridge, MA, 2009.

[12]  Barrett, S. R. H., R. E. Britter, and I. A. Waitz, "Global Mortality Attributable to Aircraft Cruise Emissions," Environmental Science and Technology. 44(19), 2010.

[13]  Koo, J. Adjoint sensitivity analysis of intercontinental impacts of aviation on air quality and health. Masters of Science Thesis, Department of Aeronautics and Astronautics, Massachusetts Institute of Technology, Cambridge, MA, September, 2011.

[14]  Ashok, A., Lee, I. H., Arunachalam, S., Waitz, I. A., Yim, S. H., & Barrett, S. R. (2013). Development of a response surface model of aviation's air quality impacts in the United States. *Atmospheric Environment*, *77*, 445-452.

— END —