# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 6, 2022                    Decided June 30, 2023

No. 21-1018

STATE OF CALIFORNIA, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AEROSPACE INDUSTRIES ASSOCIATION OF AMERICA, INC. AND
THE BOEING COMPANY,
INTERVENORS

———

Consolidated with 21-1021

———

On Petitions for Review of an Order
of the Environmental Protection Agency

———

*Theodore A.B. McCombs*, Deputy Attorney General,
Office of the Attorney General for the State of California,
argued the cause for petitioners. With him on the briefs for
State Petitioners were *Rob Bonta*, Attorney General, *Robert W.
Byrne*, Senior Assistant Attorney General, *David A. Zonana*
and *Timothy Sullivan*, Supervising Deputy Attorneys General,

2

*William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *William E. Dornbos*, Assistant Attorney General, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Gerald T. Karr*, Assistant Attorney General, at the time the brief was filed, *Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, *Joshua M. Segal*, Special Assistant Attorney General, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Peter N. Surdo*, Special Assistant Attorney General, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Matthew Eisenson* and *Gavin G. McCabe*, Assistant Attorneys General, *Judith N. Vale*, Assistant Deputy Solicitor General, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Christophe Courchesne* and *Carol Iancu*, Assistant Attorneys General, *Matthew Platkin*, Acting Attorney General, Office of the Attorney General for the State of New Jersey, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Paul Garrahan*, Attorney-in-Charge, *Steve Novick*, Special Assistant Attorney General, *Joshua D. Shapiro*, Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Ann R. Johnston*, Senior Deputy Attorney General, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Christopher H. Reitz*, Assistant Attorney General, *Joshua R. Diamond*, Acting Attorney General, Office of the Attorney General for the State of Vermont, at the time the brief was filed, *Nicholas F. Persampieri*, Assistant Attorney General, *Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, and *Caroline S. Van Zile*, Solicitor General. *Elizabeth Dubats*, Assistant Attorney General, Office of the Attorney General for the State of Illinois, and *Julia Jonas-Day* and *Turner Helen Smith*,

3

Assistant Attorneys General, Office of the Attorney General for the Commonwealth of Massachusetts, entered appearances.

*Sarah H. Burt*, *J. Martin Wagner*, *Elizabeth A. Jones*, *Scott Hochberg*, and *Vera Pardee* were on the briefs for Environmental Petitioners.

*Andrew L. Strom* and *Bertolain Elysee* were on the brief for *amicus curiae* Service Employees International Union, Local 32BJ in support of petitioners.

*Steven J. Castleman* was on the brief for *amicus curiae* Thomas C. Jorling in support of petitioners.

*Deborah A. Sivas* was on the brief for *amicus curiae* International Council On Clean Transportation in support of petitioners.

*Chloe H. Kolman*, Senior Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *Todd Kim*, Assistant Attorney General, and *Mike Thrift*, Attorney, U.S. Environmental Protection Agency.

*Amanda Shafer Berman* argued the cause for intervenor-respondents. With her on the brief were *Ronald J. Tenpas*, *Corinne Snow*, and *Thomas A. Lorenzen*. *Robert J. Meyers* entered an appearance.

*Thomas Richichi*, *David Friedland*, and *Jennifer J. Leech* were on the brief for *amicus curiae* Airlines for America in support of respondent.

Before: RAO and CHILDS, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

4

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: After finding that certain greenhouse gases endanger public health, the Environmental Protection Agency ("EPA") regulated the emission of these pollutants from aircraft engines. The Aircraft Rule aligns domestic aircraft emissions standards with those recently promulgated by the International Civil Aviation Organization ("ICAO").

Petitioners challenge the Aircraft Rule, arguing the EPA should have promulgated more stringent standards than those set by ICAO. They contend the agency acted unlawfully as well as arbitrarily and capriciously by aligning domestic standards with ICAO's technology-following standards rather than establishing technology-forcing standards. We hold that the Aircraft Rule is within the EPA's authority under section 231 of the Clean Air Act and that the agency reasonably explained its decision to harmonize domestic regulation with the ICAO standards. Accordingly, we deny the petitions for review.

I.

A.

Section 231 of the Clean Air Act tasks the EPA with regulating the emission of air pollutants from aircraft engines and provides:

> The Administrator shall, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare.

5

*See* Clean Air Act Amendments of 1970, Pub. L. No. 91-604, § 11(a)(1), 84 Stat. 1676, 1703–04, *as amended by* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, tit. IV, § 401(f), 91 Stat. 685, 791 (codified at 42 U.S.C. § 7571(a)(2)(A)).

The EPA implements this statutory mandate in a two-step process. First it makes an endangerment finding, which is a determination that a specific air pollutant emitted by aircraft engines "causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7571(a)(2)(A). Having made such a finding, the EPA promulgates emissions standards to regulate the pollutant. *Id.* The Federal Aviation Administration ("FAA") then applies the EPA's standards to certificates of airworthiness, which authorize aircraft for flight. *See id.* § 7572.

While the EPA exercises domestic regulatory authority over air pollution from aircraft engines, certificates of airworthiness must also comply with standards set by ICAO, a specialized agency of the United Nations. Pursuant to the Chicago Convention on International Civil Aviation, of which the United States is a party, ICAO is tasked with setting international standards governing air travel. *See* Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295, 320–22. These standards set a floor, but not a ceiling, on how strictly air pollution may be regulated. All parties to the Chicago Convention must recognize any certificate of airworthiness issued by another party, provided the requirements governing such certification are "equal to or above the minimum standards" set by ICAO. 15 U.N.T.S. at 318. Member states may also set more rigorous standards, provided they give immediate notice to ICAO. *Id.* at 322. Because of the interrelationship of the statutory and treaty obligations, as a practical matter, the EPA and FAA must

6

coordinate regulation of aircraft pollutants to meet both the requirements of the Clean Air Act and the international standards set by ICAO.

ICAO began regulating aircraft emissions in 1982, and since that time the EPA has consistently used its section 231 authority to align American regulations with ICAO standards.[1]

B.

In 2016, the EPA issued an endangerment finding for the emissions of six greenhouse gases from aircraft over a certain size. *See* Finding That Greenhouse Gas Emissions From Aircraft Cause or Contribute to Air Pollution That May Reasonably Be Anticipated To Endanger Public Health and Welfare ("Endangerment Finding"), 81 Fed. Reg. 54,422, 54,423–24 (Aug. 15, 2016). The agency concluded elevated concentrations of these substances were reasonably anticipated to endanger the public health and welfare by contributing to climate change. *See id.* at 54,451. Carbon dioxide accounts for the vast majority of greenhouse gas emissions from aircraft. *Id.* at 54,460. This endangerment finding triggered the EPA's obligation to promulgate standards under section 231.

Soon after the EPA issued its endangerment finding, ICAO adopted an initial set of international standards to govern carbon dioxide emissions from aircraft. *See* Control of Air Pollution From Airplanes and Airplane Engines: GHG Emission Standards and Test Procedures ("Aircraft Rule"), 86 Fed. Reg. 2,136, 2,142 (Jan. 11, 2021) (discussing the ICAO

---

[1] *See* Control of Air Pollution From Aircraft and Aircraft Engines; Emission Standards and Test Procedures, 47 Fed. Reg. 58,462, 58,467 (Dec. 30, 1982); 62 Fed. Reg. 25,356, 25,356 (May 8, 1997); 70 Fed. Reg. 69,664, 69,664 (Nov. 17, 2005); 77 Fed. Reg. 36,342, 36,342 (June 18, 2012); 87 Fed. Reg. 6,324, 6,324 (Feb. 3, 2022).

7

standards). As with all previous ICAO emission standards, the carbon dioxide standards are designed to be "technology following," meaning they "reflect[] the performance and technology achieved by existing airplanes," rather than the performance that could be achieved by new or developing technology. *See id.* at 2,137. Specifically, the standards require newly manufactured aircraft to be relatively fuel efficient by the standards of the current operational fleet, but not necessarily more efficient than the existing fleet.

The EPA eventually promulgated the Aircraft Rule, which regulated the emission of greenhouse gases from aircraft engines under section 231 by aligning domestic standards with ICAO standards. "In order to promote international harmonization of aviation standards and to avoid placing U.S. manufacturers at a competitive disadvantage," the agency determined it would "match the scope, stringency, and timing" of ICAO's carbon dioxide standards. *Id.* at 2,144.

Twelve states and the District of Columbia ("State Petitioners") and three nonprofit organizations ("Environmental Petitioners") petitioned for review. 42 U.S.C. § 7607(b)(1). We consolidated the petitions, which ask this court to hold the Aircraft Rule unlawful and to direct the EPA to issue new standards.

II.

Before turning to the merits, we must verify that we have jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998). A party lacks standing to file suit unless it has suffered an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and may be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). The Commonwealth of Massachusetts meets this test under Supreme Court precedent.

8

In *Massachusetts v. EPA*, the Court held Massachusetts had standing to challenge the EPA's denial of a petition requesting the agency regulate greenhouse gas emissions from motor vehicles. *See* 549 U.S. 497, 510–11 (2007). Applying the three standing elements, the Court concluded that Massachusetts had demonstrated a "particularized injury in its capacity as a landowner" because it could lose property if climate change caused the sea level to rise. *Id.* at 522. The EPA's "refusal to regulate" greenhouse gas emissions from motor vehicles contributed to these injuries by at least incrementally contributing to climate change, and the possible injury to the Commonwealth from rising sea levels would be "reduced to some extent if petitioners received the relief they seek." *Id.* at 523–26.

The facts here are nearly identical. Massachusetts asserts it faces "the permanent or temporary loss of the Commonwealth's coastal property" due to sea level rise caused by climate change—the exact injury the Court found sufficient in *Massachusetts v. EPA*. Traceability and redressability are also established on the same grounds, because Massachusetts asserts that the failure of the EPA to impose more stringent regulations on aircraft emissions contributes to climate change. If Massachusetts had standing in *Massachusetts v. EPA*, then it necessarily has standing here.

We need not inquire whether the other State Petitioners have sufficiently adduced standing because under the one-plaintiff rule, "[o]nly one of the petitioners needs to have standing to permit us to consider the petition for review." *Id.* at 518. The State and Environmental Petitioners press identical arguments before this court and seek the same relief, so we need not determine whether any of the environmental groups would separately have standing to challenge the Aircraft Rule. *See* State Petitioners' Opening Br. 9 (incorporating

9

Environmental Petitioners' arguments by reference). Massachusetts has standing, and we proceed to the merits.

III.

Petitioners first argue the Aircraft Rule was contrary to law because the EPA failed to apply factors required by section 231 for the reduction of emissions. We find the Rule well within the EPA's legal authority because section 231 does not mandate the consideration of any particular factors, let alone the specific factors advanced by petitioners.

The operative language of section 231 is relatively simple. Section 231(a)(2)(A) states that, after making an endangerment finding for a given pollutant, the EPA "shall, from time to time, issue proposed emission standards" for that pollutant. 42 U.S.C. § 7571(a)(2)(A). Section 231 does not specify the substantive content of the standards, nor does it specify any factors the agency must consider. As we have previously observed, the "delegation of authority" in section 231 "is both explicit and extraordinarily broad."[2] *Nat'l Ass'n of Clean Air Agencies v. EPA* ("*NACAA*"), 489 F.3d 1221, 1229 (D.C. Cir. 2007).

In the Aircraft Rule, the EPA complied with these limited requirements. First, the agency concluded that greenhouse gases "cause[], or contribute[] to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7571(a)(2)(A); Endangerment Finding,

---

[2] As petitioners do not argue section 231 violates the nondelegation doctrine, the issue is not before us. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (explaining that Article I "permits no delegation" of the legislative power vested in Congress and that Congress must provide an "intelligible principle" when it "confers decisionmaking authority upon agencies").

10

81 Fed. Reg. at 54,423–24. Having made this endangerment finding, the EPA had to "issue proposed emission standards," a requirement it satisfied by promulgating the Aircraft Rule.[3] 42 U.S.C. § 7571(a)(2)(A).

Petitioners dispute this straightforward application of section 231(a)(2)(A). They suggest that, read in context, the EPA is required to consider the emission reductions that may be achieved with feasible technology, even if such technology is not currently in use. Specifically, petitioners rely on section 231(a)(1), which required the EPA to "commence a study" of aircraft emissions within 90 days of December 31, 1970, and determine "the technological feasibility of controlling such emissions." *Id.* § 7571(a)(1). Petitioners maintain the EPA must consider "technological feasibility" as a discrete factor when promulgating rules under section 231, an interpretation they argue is confirmed by section 231(b)'s requirement that the agency provide adequate lead time for the "development and application" of any new technology. *Id.* § 7571(b). They contend the EPA acted contrary to law by adopting standards that reflect widely available technology rather than feasible technology that would result in greater emissions reductions.

Petitioners' interpretation does not comport with the plain meaning of the Clean Air Act. Section 231(a)(1) required the EPA to conduct a one-time study and investigation in 1971;

---

[3] The EPA's authority is cabined by only two other provisions. The Administrator "shall not change the aircraft engine emission standards if such change would significantly increase noise and adversely affect safety." 42 U.S.C. § 7571(a)(2)(B)(ii); *see also id.* § 7571(c) (permitting the President to disapprove a regulation if it "would create a hazard to aircraft safety"). In addition, there are restrictions on regulations that impose new technology. *Id.* § 7571(b). Petitioners do not argue the Aircraft Rule implicates these limitations.

11

nothing in the statute suggests the agency must adopt the same approach on an ongoing basis.[4] And section 231(b) presupposes the EPA has discretion to issue regulations requiring the "development and application" of new technology, but it does not suggest the agency is required to do so. In other provisions of the Clean Air Act, Congress has explicitly required the EPA to consider enumerated factors or to adopt a technology-forcing approach. *See, e.g.*, 42 U.S.C. § 7412(d)(2) (mandating the EPA "require the maximum degree of reduction" that is "achievable" in regulating hazardous air pollutants); *id.* § 7521(a)(3)(A)(i) (requiring EPA standards for motor vehicle emissions "reflect the greatest degree of emission reduction achievable" through available technology). In the context of aircraft emissions standards, section 231(a)(2)(A) requires only that the EPA "shall issue" standards, without specifying the way in which the agency must do so.

For these reasons, we have previously held section 231 does not mandate any sort of technology-forcing approach. In *NACAA*, we explained that it was consistent with the Clean Air Act for the EPA to require the use of existing technology and to align domestic regulations with the ICAO standards for nitrous oxide emissions. *See* 489 F.3d at 1225; *id.* at 1230 (determining section 231 "conferred broad discretion to the Administrator to weigh various factors in arriving at

---

[4] In their opening brief, the Environmental Petitioners selectively quoted section 231(a)(1) by omitting the requirement that the EPA "commence" the study "[w]ithin 90 days after December 31, 1970." 42 U.S.C. § 7571(a)(1). This misleading elision distorted the statutory text in support of petitioners' argument that the EPA has an ongoing requirement to consider technological feasibility. We remind litigants that they must faithfully represent governing law to this court.

12

appropriate standards"). The Aircraft Rule permissibly implemented section 231 by aligning domestic regulations with ICAO standards.

IV.

Petitioners also argue the Aircraft Rule was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). They advance three reasons: (1) by aligning the domestic standards with the ICAO standards, the EPA failed to account for the harms of climate change; (2) the EPA failed to consider alternatives that would reduce greenhouse gas emissions; and (3) the EPA failed to sufficiently consider the effects of the Aircraft Rule on minority and low-income populations and on federalism interests, as required by executive order.

While petitioners may disagree with the EPA's decision to align domestic regulations with ICAO standards, they have not established that the Aircraft Rule was arbitrary and capricious. And given the agency's conclusion about the importance of harmonization with ICAO standards, there was no reason to consider petitioners' alternatives, which would have required departure from those standards. Finally, we cannot review the agency's compliance with executive orders that are unreviewable.

A.

Petitioners contend the EPA neglected to consider the harms of climate change and thereby "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). They suggest the Aircraft Rule unreasonably failed to engage with the harms of climate change or the need to reduce emissions, despite the EPA's endangerment finding. Petitioners maintain it was arbitrary and capricious for the

13

agency to prioritize harmonization with international standards over imposing more stringent domestic emissions standards.

We disagree because the EPA's decision to align domestic regulation with the ICAO standards rested on the reasonable judgment that the best way to reduce greenhouse gas emissions globally would be to align with international standards, rather than to exceed them. In the Aircraft Rule, the EPA explained that "aligning domestic standards with the ICAO standards, rather than adopting more stringent standards, will have substantial benefits for future international cooperation on airplane emission standards, and such cooperation is the key for achieving worldwide emission reductions." 86 Fed. Reg. at 2,144–45. As the agency emphasized, it had "invested significant effort and resources … to gain international consensus within ICAO to adopt the first-ever international [carbon dioxide] standards for airplanes." *Id.* at 2,158.

The EPA determined that given the international nature of both aircraft emissions and climate change, it was critically important that domestic regulations not undermine the ICAO standards. Effective reduction of greenhouse gas emissions from aircraft engines requires international coordination because almost three-quarters of such emissions are generated by aircraft beyond the reach of American regulators. *See id.* at 2,143 n.51. In order for the ICAO standards to compel adherence, "[r]eciprocity and consistency are essential, specifically the worldwide mutual recognition of the sufficiency of ICAO's standards and the avoidance of any unnecessary difference from those standards in each Member State's law." *Id.* at 2,157.

The EPA also explained that a unified set of domestic and international standards would be beneficial for the aircraft industry by "decreas[ing] administrative complexity for

14

airplane manufacturers and air carriers." *Id.* Such uniformity would be "key" for "manufacturers as they become familiar with adhering to [ICAO's] standards." *Id.* at 2,158. The EPA has noted in other section 231 rules the importance of international regulatory uniformity for manufacturers and consumers. *See* Control of Air Pollution From Aircraft Engines: Emission Standards and Test Procedures, 87 Fed. Reg. 72,312, 72,314 (Nov. 23, 2022) (finding that uniformity "helps reduce barriers in the global aviation market, benefiting both U.S. aircraft engine manufacturers and consumers").

Nor are we persuaded by petitioners' suggestion that by consistently aligning domestic standards with the ICAO standards, the EPA has impermissibly delegated its regulatory authority to an international body. The EPA cannot abdicate its section 231 responsibilities and transfer them to ICAO. *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004) ("A general delegation of decision-making authority to a federal administrative agency does *not*, in the ordinary course of things, include the power to subdelegate that authority beyond federal subordinates."). But there was no such delegation here: the EPA never conferred on ICAO any authority to make rules under section 231. The EPA simply chose, within its rulemaking process, and in compliance with the notice and comment procedures of the APA and United States treaty obligations, to align domestic emissions standards with the ICAO standards.

The EPA's explanations of its regulatory choice were reasonable. Having concluded it was of paramount importance that the global community align on the ICAO standards, the EPA determined it would be preferable for regulatory developments to be channeled through that process, rather than through uncoordinated domestic regulation across member states. Indeed, the EPA has consistently harmonized aircraft

15

emission standards under section 231 with the ICAO standards. *See supra* note 1; *NACAA*, 489 F.3d at 1225. Implementing more stringent domestic regulations, even if beneficial in the short term, could undermine confidence in the ICAO process or make it more difficult to coordinate more stringent international standards in the future. As the EPA noted, such considerations were particularly critical to ICAO's inaugural regulation of greenhouse gas emissions.

In the Aircraft Rule, the EPA reasonably recognized the problems of climate change and explained why it chose to harmonize domestic aircraft emission standards with the ICAO standards.

B.

Petitioners next argue the EPA failed to consider three alternatives that would reduce greenhouse gas emissions. First, they argue the EPA could have required all newly produced aircraft be as fuel efficient as the most efficient aircraft currently in the global fleet. Second, the EPA could have adopted technology-forcing standards designed to achieve emissions reductions over the current fleet. Third, the EPA could have considered other measures to reduce emissions beyond fuel efficiency, such as requiring operational changes or the use of alternative fuels.

It may be arbitrary or capricious for an agency to ignore an obvious alternative, such as when the failure to consider an alternative reflects a failure to "consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. But section 231 does not explicitly require the EPA to study alternative regulatory approaches, and under the APA the question is whether the agency acted reasonably in considering the options before it.

16

In the Aircraft Rule, the EPA reasonably prioritized harmonization with ICAO standards and that policy choice foreclosed petitioners' alternatives. The EPA addressed the alternatives raised by the petitioners, recognizing that commenters had proposed standards that were more stringent and technology-forcing. The EPA concluded, however, that implementing such standards would delay bringing U.S. regulations into line with the ICAO standards that had already gone into effect. Any further delay would result in hardship to American manufacturers, which must navigate lengthy timelines for the certification and sale of new aircraft.

The EPA's explanation of its choice was sufficient, particularly because none of the alternatives proposed by petitioners would have achieved one of the central goals of the Aircraft Rule—harmonizing domestic regulations with the ICAO standards. Each of the alternatives instead proposed more stringent domestic regulations, whether through stricter fuel efficiency standards or through operational changes not mandated by ICAO. Given the agency's reasonable conclusion that the best way to reduce global greenhouse gas emissions was to coordinate around the ICAO standards, there was no need for the agency to exhaustively examine alternatives that departed from these standards.

C.

Finally, petitioners suggest the EPA acted arbitrarily and capriciously by issuing only brief statements at the end of the Aircraft Rule regarding compliance with two executive orders. Executive Order 12,898 requires federal agencies to consider the environmental effects of their actions on minority and low-income populations. *See* Exec. Order 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994). Executive Order 13,132 requires agencies to consider the effects of their actions on the balance

17

between the federal government and the states. *See* Exec. Order 13,132, 64 Fed. Reg. 43,255 (Aug. 4, 1999). In the Aircraft Rule, the EPA simply concluded that the Rule complied with these executive orders, as well as others. 86 Fed. Reg. at 2,170–71.

Petitioners' claims are explicitly foreclosed by the executive orders. Both orders state they are "intended only to improve the internal management of the executive branch" and provide no right to judicial review. *See* Exec. Order 12,898, 59 Fed. Reg. at 7,632–33 ("This order shall not be construed to create any right to judicial review."); Exec. Order 13,132, 64 Fed. Reg. at 43,259 ("This order … is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.").

As we have previously explained, an executive order "devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not … subject to judicial review." *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993). Such orders simply serve as presidential directives to agency officials to consider certain policies when making regulatory decisions. They do not create free-standing private rights to enforce such policies because an executive order is not "law" within the meaning of the Constitution or the APA. *See* U.S. Const. art. I, § 1; 5 U.S.C. § 706.

Petitioners argue the Aircraft Rule is arbitrary and capricious because it fails to comply with these executive orders, but "such an argument is nothing more than an indirect—and impermissible—attempt to enforce private rights under the order." *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 9 (D.C. Cir. 1999). The cases petitioners cite in favor of our

18

review are easily distinguishable. For instance, we have allowed review of regulations under the National Environmental Policy Act ("NEPA") and the APA when the agency's analysis reflected policies implicated by Executive Order 12,898. *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004). We carefully explained, however, that the claim was reviewable only because it did not arise under the Executive Order, but rather under NEPA, which imposes statutory obligations that agencies must execute consistent with the requirements of the APA. *See id.*; *see also Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021) (reiterating that Executive Order 12,898 on environmental justice "does not create a private right to judicial review" but "a petitioner may challenge an agency's environmental justice analysis as arbitrary and capricious under NEPA and the APA").

By contrast, petitioners' claims implicate no independent statutory requirements and instead rely exclusively on the two executive orders. The Aircraft Rule simply includes short boilerplate conclusions about compliance with the orders. Because these statements provide no substantive analysis under NEPA or any other statute, review of petitioners' claims would simply be to assess whether the EPA correctly concluded there are no environmental justice or federalism consequences within the meaning of the executive orders. Such review, however, would be tantamount to recognizing a private right to enforce the executive orders, which is foreclosed by the orders as well as by our precedents. *See Air Transp. Ass'n*, 169 F.3d at 9. Petitioners cannot bootstrap private enforcement of executive orders into arbitrary and capricious review.

\* \* \*

19

The EPA possesses substantial discretion to regulate aircraft emissions under section 231 of the Clean Air Act. In aligning domestic regulation with standards promulgated by ICAO, the EPA acted lawfully, and petitioners have not shown the agency's decision was arbitrary and capricious. The petitions for review are denied.

*So ordered.*